HARMON, Appellant,

v.

**BELCAN ENGINEERING GROUP, INC. et al., Appellees.**

[Cite as *Harmon v. Belcan Eng. Group, Inc.* (1997), 119 Ohio App.3d 435.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–950573.

Decided April 30, 1997.

*Manley, Burke, Lipton & Cook, Carol S. Wood* and *W. Kelly Lundrigan,* for appellant.

*Cors & Bassett, Robert J. Hollingsworth* and *Curtis L. Cornett,* for appellees.

*Per Curiam.*

On April 6, 1994, appellant June A. Harmon filed a complaint in the Hamilton County Court of Common Pleas alleging that she was subjected to unlawful *quid pro quo* sexual harassment by appellees Isaac Gilliam and Belcan Engineering Group, Inc. ("Belcan"), in violation of R.C. 4112.02 and 4112.99. The complaint also included a negligent-supervision/retention claim against Belcan. Subsequently, appellant filed a federal civil rights claim and appellees removed the cause to the United States District Court for the Southern District of Ohio. The cause was remanded to the Hamilton County Court of Common Pleas after appellant dismissed her claim under federal law.

Appellees filed a motion for summary judgment on June 30, 1995. Following oral argument on August 3, 1995, the trial court granted appellees' motion by entry dated August 8, 1995. Appellant appealed on August 9, 1995.

Appellant's two assignments of error, which allege that the trial court erred in granting appellees' motion for summary judgment on appellant's claims for sexual harassment and negligent supervision/retention, will be considered together.

In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.,* Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Little Forest Med. Ctr. v.*

*Ohio Civ. Rights Comm.* (1991), 61 Ohio St.3d 607, 609–610, 575 N.E.2d 1164, 1167, quoting *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200, 202–203, 421 N.E.2d 128, 131; *Neal v. Hamilton Cty.* (1993), 87 Ohio App.3d 670, 676–677, 622 N.E.2d 1130, 1135; *Pulver v. Rookwood Highland Tower Invest.* (Mar. 26, 1997), Hamilton App. Nos. C–950361 and C–950492, unreported, 1997 WL 133422. In analyzing statutory sexual-harassment claims, we look to the statute, R.C. 4112.02(A),[1] to the administrative counterpart,[2] and to federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code. *Delaney v. Skyline Lodge, Inc.* (1994), 95 Ohio App.3d 264, 270, 642 N.E.2d 395, 399; *Retterer v. Whirlpool Corp.* (1996), 111 Ohio App.3d 847, 677 N.E.2d 417.

 *Quid pro quo* sexual harassment occurs where the employee's submission to or rejection of unwelcome sexual conduct is used as the basis for promotion or other employment decisions. *Western–Southern Life Ins. Co. v. Fridley* (1990), 69 Ohio App.3d 190, 194, 590 N.E.2d 325, 328. To prevail on a claim for *quid pro quo* sexual harassment, the employee-plaintiff must show (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits, or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability. *Kauffman v. Allied Signal, Inc.* (C.A.6, 1992), 970 F.2d 178, 185–186; *Highlander v. K.F.C. Nat. Mgt. Co.* (C.A.6, 1986), 805 F.2d 644, 648. In an action for *quid pro quo* sexual harassment, an employer is held strictly liable for the conduct of its

---

**1.** R.C. 4112.02 provides:

"It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

**2.** Ohio Adm.Code 4112–5–05(J) provides:

"(1) Harassment on the basis of sex is a violation of division (A) of section 4112.02 of the Revised Code. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute harassment when:

"(a) Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

"(b) Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual[.]"

supervisory employees having authority over hiring, advancement, dismissal, and discipline, under the theory of respondeat superior. *Id.*

In granting appellees' motion for summary judgment in the case *sub judice*, the trial court held that appellant had failed to meet her burden of proof with respect to two of the required elements of a claim for *quid pro quo* sexual harassment. Specifically, the trial court held that appellant did not show that she was subjected to unwelcomed sexual advances or that she was subjected to a tangible job detriment as a result of her refusal to submit to the alleged sexual advances. The court further determined that because appellant had not set forth sufficient evidence to support her sexual-harassment claim, her claim for negligent supervision/retention also failed.

Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and with the evidence viewed most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

In *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274, the Ohio Supreme Court stated:

"Accordingly, we hold that a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party."

Appellant argues that when the evidence is construed most strongly in her favor, she has set forth a prima facie case of *quid pro quo* sexual harassment and raised genuine issues of material fact such that reasonable minds can reach different conclusions as to whether she was subjected to unlawful *quid pro quo* sexual harassment.

Construed most strongly in appellant's favor, the evidence shows that appellant was employed by appellee Belcan as a designer doing engineering and drafting work. She met appellee Gilliam, who headed Belcan's Pulp and Paper Technology Group, during smoking breaks. As early as July 1993, appellant suspected that Gilliam was interested in more than a professional relationship with her. Gilliam frequently told appellant that she was the best dressed and most attractive woman in the office. Gilliam asked appellant out to dinner and to his apartment. Appellant went to dinner with Gilliam, where she attempted to deflect attention from herself by introducing Gilliam to her friends, hoping that he would show interest in one of them. During two separate dinners, Gilliam put his arm around appellant's waist, but she removed it. Gilliam attempted to kiss appellant on two occasions. On at least one occasion, she turned her head and converted the attempted kiss into a hug.

In her affidavit submitted in opposition to appellees' motion for summary judgment, appellant stated that during one dinner Gilliam told her about sexual problems he was experiencing with his wife, whom he was in the process of divorcing. According to appellant, Gilliam told her that he wanted to "meet a woman he could travel with and have good sexual relations with" and then asked her "if she liked to travel." [3]

In approximately July 1993, Gilliam approached appellant about transferring into the newly created position of Marketing Coordinator in the Pulp and Paper Technology Group. Gilliam offered appellant the position in spite of the fact that he knew that she did not have a marketing background, that she did not possess clerical or typing skills, and that she did not have a working knowledge of certain computer software programs she would be using in the position. Gilliam assured appellant that her lack of skills would not be a problem and that he believed that

---

**3.** Appellees argue that appellant's affidavit should not be considered because it contradicts her deposition testimony. We disagree. The affidavit does not contradict her deposition testimony; it supplements the testimony. When asked during her deposition what events appellant believed showed sexual harassment, she stated that aside from those to which she had already testified, she could not think of any. Presumably, appellant remembered the dinner incident after her deposition was taken. Appellees also contend that the affidavit should not be considered because appellant's counsel stipulated at the deposition that there was nothing to indicate sexual harassment other than the events mentioned previously in her deposition testimony. However, appellees' counsel declined to accept that stipulation, stating, "That doesn't help me." We point out that the trial court considered the statements contained in the affidavit during oral argument on appellees' motion for summary judgment.

she had the potential to do the job. He also told appellant that she would be provided the necessary resources and training. Gilliam indicated that appellant could double or triple her salary within two or three years. Appellant accepted the position of Marketing Coordinator and was placed under Gilliam's direct supervision. On August 23, 1993, approximately two weeks after appellant's transfer to the Marketing Coordinator position, she was assigned a project that involved preparing a comprehensive business plan for the Pulp and Paper Technology Group. The project, which had been in progress for several months, required knowledge of certain computer software programs which appellant was in the process of learning.

On August 25, 1993, Gilliam took appellant to a marketing seminar in Atlanta. Appellant asked Gilliam how she was doing in her new position, to which he responded that she was "doing just great." While they were in Atlanta, appellant confronted Gilliam about her concern that he wanted a romantic relationship with her. Appellant reminded Gilliam that she had a boyfriend and that she wanted to keep her relationship with Gilliam strictly professional. Gilliam assured appellant that he had no "hidden agenda" with respect to hiring her for the Marketing Coordinator position. He also told appellant that he "liked her very much." Immediately after this conversation, Gilliam's treatment of appellant changed.

The following day, Gilliam left Atlanta to attend another out-of-town seminar, and appellant returned to Cincinnati. Another Belcan employee informed appellant that Gilliam had stated that the business plan was to be completed by the time Gilliam returned from his business trip, in approximately four days. Appellant, who was responsible for the graphics portion of the business plan, testified that it was an impossible task. The business plan, which was already approximately two to three months late, took months to complete after appellant left the Marketing Coordinator position.

The day before Gilliam returned to Cincinnati, appellant informed him by telephone that she had been unable to complete the project by the deadline. Gilliam responded that he wanted to see whatever appellant had completed the next day.

Upon his return, appellant showed Gilliam the graphics portion of the business plan, which was about ten to fifteen percent completed. Gilliam looked at what appellant had done, turned, uttered a profanity and stormed out of appellant's office. Appellant followed Gilliam to his office, where a heated discussion took place. Gilliam told appellant that "the learning curve was over" and that he could not afford to pay appellant what he was paying her. Gilliam also stated that he had to "meet with his team players" about "what to do with" appellant. Gilliam testified in his deposition that he told appellant that the "management team" was

going to have to review appellant's performance during the next week, and then decide what "was going to be done" about appellant.

Appellant understood by Gilliam's remarks that he intended to fire her, and she asked to be transferred back to the Engineering Department. Appellant believed that Gilliam's reaction to her work and his comments about her performance were directly related to the conversation they had in Atlanta where she had made it clear that she was not interested in a personal relationship with Gilliam, because that was the only circumstance that had changed in the week's time between Gilliam's telling appellant that she was doing a "great job" and the confrontation in Gilliam's office. Appellant's belief that Gilliam intended to terminate her employment is supported by Gilliam's statement in his deposition that appellant "wasn't being criticized or discharged for anything other than the performance on preparing graphics for the business plan."

Appellant took her concerns about sexual harassment to Robert Przybylowicz, Belcan's Vice President of Human Resources. Appellant admitted that there was "nothing really overt" about Gilliam's conduct. When Przybylowicz asked appellant the basis for her claim that Gilliam was "hitting on her," she stated, "It's just a feeling." Przybylowicz questioned Gilliam about appellant's accusations, whereupon Gilliam became angry and stated that his only concern was getting his work done. Appellant was subsequently assigned to Ken Ziemak, Belcan's Resource Manager, who tried for approximately one month to find another position for her.

Ziemak testified in his deposition that while he was trying to find another position for appellant at Belcan, Gilliam asked Ziemak, "What are you doing about June Harmon, or why is June Harmon still here?" Ultimately, Ziemak terminated appellant's employment. Appellant testified in her deposition that when she asked Ziemak why she was being terminated, Ziemak stated that he thought that Gilliam had recommended her for layoff because she "didn't put out." Appellant also testified that Ziemak stated, "I guess you didn't give Isaac what he wanted, so you're out the door." [4]

Appellees' evidence tended to show that appellant became disillusioned with the Marketing Coordinator position because of her difficulties in performing the job. Further, appellant discovered that three other Belcan employees had turned down the Marketing Coordinator position because Gilliam was known as a

---

4. Appellees argue that Ziemak's alleged statements should not be considered because they constitute hearsay. We disagree. The trial court took the statements into consideration in ruling on the motion for summary judgment. There is a sufficient foundation in the record to conclude that the statements are admissible pursuant to Evid.R. 801(D)(2)(d) as admissions by a party opponent because they were offered against Belcan and were made by Belcan's employee concerning a matter within the scope of his employment during the existence of the employment relationship. See *Delaney v. Skyline Lodge, Inc.* (1994), 95 Ohio App.3d 264, 642 N.E.2d 395.

difficult manager who set impossible deadlines. Appellees presented evidence that Gilliam's criticism of appellant was based solely on her poor work performance as Marketing Coordinator, that appellant had essentially quit the position of Marketing Coordinator when she asked to be transferred back to the Engineering Department, thereby negating the possibility of disciplinary action by Gilliam short of termination, that appellant's billable hours as a percentage of hours worked were substantially below Belcan's minimum of eighty to eighty-five percent during the month that she worked under Ziemak, and that appellant was ultimately laid off by Ziemak because of a lack of productive work. Ziemak denied making any statement to the effect that appellant was terminated because she would not "put out."

Construing the evidence set forth above, and the inferences drawn therefrom, most strongly in favor of appellant, we hold that she presented evidence that created genuine issues of material fact such that reasonable minds could conclude that she was subjected to unwelcomed sexual advances, and that she suffered a tangible job detriment as a result of her unwillingness to submit to the sexual advances.

We point out that appellant's evidence showed that she did not respond to Gilliam's advances and that on more than occasion she actively resisted him. For example, when Gilliam attempted to kiss appellant, she turned her head, converting the attempted kiss into a hug. After appellant made it clear that she had no interest in a personal relationship with Gilliam, he began to treat her differently, placing impossible demands on her. Further, appellant presented evidence that Gilliam intended to fire her from the Marketing Coordinator position, and that even after she was transferred from his department, Gilliam continued to attempt to have appellant terminated from her employment by pressuring Ziemak to fire her. In addition, there was evidence that, if believed, showed that appellant was terminated because she would not "put out." [5]

We hold that the trial court erred in granting appellees' motion for summary judgment. The assignments of error are sustained. The judgment of the trial court is reversed, and the cause is remanded for further proceedings consistent with law and this decision.

*Judgment reversed*
*and cause remanded.*

DOAN, P.J., GORMAN and SHANNON, JJ., concur.

---

5. The trial court recognized the existence of competing inferences, stating:
 " 'Put out' could mean she didn't put out the job she was supposed to. Putting out the work hours she was supposed to do. Could also mean a sexual thing. I don't know."

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.