WILLE, Appellant,

v.

HUNKAR LABORATORIES, INC. et al., Appellees.

[Cite as *Wille v. Hunkar Lab., Inc.* (1998), 132 Ohio App.3d 92.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–971107.

Decided Dec. 31, 1998.

*Donna Bergmann* and *H. Toby Schisler,* for appellant.

*Doreen Canton,* for appellees.

HILDEBRANDT, Judge.

## I. INTRODUCTION AND FACTS

In this case we must decide whether the lower court properly granted summary judgment in favor of defendants-appellees, Hunkar Laboratories, Inc. ("HLI") and its president, Denes Hunkar, on the complaint filed by plaintiff-appellant, Christy Wille. Wille, a former employee of HLI, brought suit against HLI and Hunkar asserting claims of sexual harassment in violation of state and federal law, the common-law tort of sexual harassment, unlawful retaliation under state and federal law, and constructive discharge. After reviewing the entire record, we hold that summary judgment was improvidently granted, and we reverse the judgment of the Hamilton County Court of Common Pleas.

## II. STANDARD OF REVIEW

A court may grant summary judgment only when one party demonstrates that the record is devoid of genuine issues of material fact, the party moving for summary judgment is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, that being adverse to the nonmoving party.[1] Summary judgment is a procedural device to avoid a formal trial where no issues exist to be tried. It must be entered with caution, with doubts resolved, and the evidence and inferences construed most strongly, in favor of the non-moving party.[2]

---

1. Civ.R. 56(B); see, *e.g., Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801; *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274.

2. *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 2, 24 O.O.3d 1, 2, 433 N.E.2d 615, 616; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

An appellate court reviews the record *de novo* to determine whether the party moving for summary judgment has met its burden. Construing the evidence and all inferences in the light most favorable to Wille, we find the following events reflected in the record.

## III. BACKGROUND

In August 1994, Wille accepted a sales job with HLI, an Ohio corporation that manufactures plastic components. Its principal place of business is in Cincinnati, but it sells its products nationally. Following her graduation from college, Wille took the job with HLI over other opportunities for several reasons. She was specifically recruited by Michael Muller, HLI's sales manager, whom Wille had met while taking a class that he taught. Second, the base pay at HLI was $10,000 greater than that offered by another company where she had an opportunity to work. Third, the HLI job provided an opportunity to travel.

HLI employed both inside and outside sales representatives. The outside representatives personally called upon customers, while the inside representatives called on customers by telephone. Wille was the first female to work as an outside sales representative for HLI. The record reveals that men traditionally dominated the outside sales positions for the entire industry. There is no question that Wille was qualified for the position for which she was hired and that her job performance was always at least satisfactory. The record shows that Wille always conducted herself in a professional manner.

Wille's claims of harassment stem primarily from her interactions with Andy Fricke, HLI's senior sales representative, and Denes Hunkar, HLI's president and founder. When Wille first became employed with HLI, she was assigned to call upon customers in the southeastern United States. In order to learn her duties, she was required to travel with and observe Fricke, the senior sales representative, as he called upon customers. Fricke had worked at HLI for thirty years, and he was also Hunkar's cousin. Hunkar referred to Fricke as a "dirty old man" on a number of occasions, but nevertheless required Wille to travel alone with Fricke.

Wille testified that, during her tenure with HLI, she was subjected to repeated instances of offensive sexual conduct directed at her and that the environment in which she had to work was permeated with demeaning sexual language and conduct. Wille testified to numerous specific occasions when this occurred. While traveling together in Florida, Fricke asked Wille if she wanted to stay another day and go to Disney World. When Wille expressed her pleasure with the idea, Fricke told her that they could stay, but only if she agreed to share a room with him. On another occasion, Fricke told Wille that she had two choices

for the evening: going out to dinner or staying at the hotel and having sex. Fricke suggested on other occasions that Wille have sex with him.

During sales calls, Fricke told customers that he had brought Wille along with him so that they would have something good to look at. He also told customers that when he traveled with Wille, he did not need to work out himself; all he had to do to get his heart pumping was watch Wille work out. On one occasion when Wille secured a sales appointment with a customer, Fricke told her that the customer only wanted to see her because he was horny.

On another occasion, Wille and several other HLI employees were having dinner with Hunkar, when Hunkar performed what was known as the "One–Hundred–Dollar Trick" on Wille. Hunker took a one-hundred-dollar bill from his wallet. He asked Wille to approach him. Wille was reluctant but eventually agreed to go to where Hunkar was seated. In front of the rest of her co-workers, he told her that he would give her the one-hundred-dollar bill if she would agree to let him spank her. Hunkar then patted Wille on her buttocks and gave her a twenty-dollar bill. According to Hunkar, the "trick" was that Wille received only twenty dollars because he merely patted her. Wille stated that she was humiliated by the incident. During meetings with sales representatives, Hunkar attempted to motivate the salespeople by telling them that "the aggressive dog gets to screw all the bitches."

During the 1994 office Christmas party, Hunkar, in the presence of Wille and her co-workers, presented Wille with the "Broken Cherry Award," which allegedly was given to commemorate her first sale. Hunkar testified that he recognized the sexual connotation of the award's name, but stated that the "award" was presented to every sales representative and that it was regularly displayed by the recipients.

Wille testified that, during a business dinner with independent sales representatives, Hunkar suggested that Wille have another drink and go back to their hotel with one of the independent representatives. Hunkar told customers that he hired Wille so that her legs could do some of the selling. Hunkar also stated that he assigned Wille to the southeastern region because "rednecks" in the south would buy from women with nice legs.

In his deposition, Hunkar admitted that he, Fricke, and almost all of the other men in the office repeatedly told sexual jokes in the workplace while Wille was present. These jokes were sexually explicit, vulgar, and demeaning to women. During a presentation to employees, Hunkar had screen savers featuring scantily clad women in provocative poses appear on the projection screen. Fricke came into her office several times, uninvited, and rubbed her shoulders. Fricke also asked her what type of men made her "hot."

Wille stated that she found her work environment difficult and that she was offended and embarrassed by the conduct described above. HLI had no official or unofficial policy relating to the prohibition of sexual harassment in the workplace or relating to the proper channels for an employee to follow in the event that the employee felt sexually harassed. Wille therefore did not know to whom she could or should bring her concerns regarding Fricke's and Hunkar's conduct.

In June 1996, Wille expressed her concerns to her immediate supervisor, Charles Koehler. Koehler told Wille that he could not do anything about Hunkar's conduct because he was the CEO of HLI, but stated that Wille should tell him if Fricke harassed her in the future. Although no further occasions of offensive conduct occurred during the next week, Wille was upset that she had received no feedback on her complaints.

A week after Koehler had been informed of Wille's complaints, HLI received a letter from Wille's counsel in which those complaints were reiterated. The letter further demanded, *inter alia,* that HLI conduct an investigation of Wille's complaints, discipline Fricke, and adopt a policy against sexual harassment.

As a result of the letter from Wille's counsel, a meeting was arranged between Wille, her counsel, and Hunkar. Hunkar agreed to take immediate action and to have an independent investigation of Wille's allegations. Despite those assurances, Hunkar himself performed the "investigation" of the sexual harassment alleged by Wille. Hunkar had also agreed to discipline Fricke for his conduct, but that discipline ultimately took the form of a verbal "reprimand," which was different from the written warnings Fricke had been given for past company policy infractions, such as expense-account violations. Hunkar stated that he did not believe that Fricke had done anything wrong or had engaged in any conduct that differed from the behavior of other male employees.

Hunkar also prepared and distributed a written policy regarding sexual harassment. While the official policy indicated that sexual harassment would not be condoned or tolerated, it stated that the president of the company, Hunkar himself, had ultimate authority to interpret the policy.

Following the meeting between Hunkar, Wille, and Wille's attorney, Wille began to notice unusual occurrences in her work routine. She claimed that she was excluded from, or never informed of, training sessions on new products. According to Wille, these training sessions were crucial to her success as a salesperson for the company. Although Hunkar denied that she had been purposefully excluded from the meetings, he admitted that she was the only salesperson who was not present at the meetings.

Wille contacted her attorney about the exclusion, and her attorney sent another letter to HLI. Upon receipt of the letter, Hunkar told Wille to stop having her attorney send him letters, because he considered the communications "pure harassment." According to Wille, Hunkar berated her for bringing claims against the company and told her that no one at HLI wanted to work with her any longer.

Wille claims that, a few days later, Hunkar offered her a new job, which he described as a promotion, but stated that she would be promoted only if she would drop her claims against the company. Hunkar allegedly told her that working at the company would be very difficult for her if she pursued her claims. In his deposition, Hunkar agreed that he had tried to get Wille to drop her claims by offering her a "package" deal, which he claimed would enable her to save face in the company and allow her to continue to work with the other employees. Wille claims that she understood from Hunkar's conduct that her working conditions would continue to deteriorate and that she did not have a future at HLI. On July 30, 1996, more than a month after the letter to HLI from her counsel, she submitted her letter of resignation.

Wille's amended complaint and jury demand were filed on January 30, 1997. She brought claims against both HLI and Hunkar individually for (a) creating and maintaining a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, Sections 2000e *et seq.*, Title 42, U.S.Code, and in violation of R.C. Chapter 4112; (b) common-law sexual harassment, a tort pursuant to *Kerans v. Porter Paint Co.*;[3] (c) retaliation in violation of Title VII and R.C. Chapter 4112 for her complaints about the sexually hostile work environment; and (d) constructive discharge.

Hunkar and HLI filed motions for summary judgment, which the trial court granted. Wille has appealed that judgment to this court, raising five assignments of error.

## IV. ASSIGNMENTS OF ERROR

### A. FIRST ASSIGNMENT OF ERROR

In her first assignment of error, Wille urges that the lower court erred by granting summary judgment in favor of Hunkar on her sexual-harassment claims against him individually. Resolution of this issue first requires an abbreviated explanation of the types of possible liability for sexual harassment.

---

3. *Kerans v. Porter Paint Co.* (1991), 61 Ohio St.3d 486, 575 N.E.2d 428.

## 1. CORPORATE LIABILITY: VICARIOUS AND DIRECT LIABILITY

■ First, liability can be imposed upon a corporation or other business entity. In Ohio, an employer, as an entity, may be held liable for the unlawful harassing conduct of one of its employees under the doctrine of *respondeat superior*.[4] Such liability is vicarious because one entity (the employer) is being held liable for another's conduct (the harassing employee).

· ■ An employer, again as an entity, may also be held directly liable for *its own* conduct if the employer knows or has reason to know that unlawful harassment is occurring or is likely to occur and fails to take action to prevent or correct the behavior.[5] Such liability is not vicarious, although the harassing conduct of another person is involved, because it is based on the *employer's* own action or inaction.

## 2. DIRECT INDIVIDUAL LIABILITY

This court has also recognized that liability for sexual harassment may be imposed upon an individual in certain circumstances. In *Hart v. Justarr Corp.*,[6] this court held that an individual could be directly liable in connection with the harassing conduct of another employee if the individual was an "employer" as that term is defined in R.C. 4112.02. In *Hart*, the plaintiff sued for sexual harassment in violation of R.C. 4112.02 against *an individual* who was both a director and an officer of the corporation that employed the plaintiff. The plaintiff in *Hart* alleged that the director either knew or should have known about the conduct of the employee she claimed was harassing her and therefore could be directly liable for the harassment pursuant to *Kerans*. The question that this court faced was whether the officer of the corporation could be considered an "employer" and therefore held liable in negligence for his own conduct pursuant to the rule announced in *Kerans*.[7]

Resolution of that issue, we held, involved an inquiry into the extent of the individual's authority and power to "employ, retain, and dismiss" the employee-harasser. Relying on cases cited with approval in *Kerans*, we noted that "other courts have imposed an individual duty on administrators * * * to control the actions of persons under their supervision." Because the director in *Hart* had "unfettered power" to control the harasser's employment, we held that the

---

**4.** *Harmon v. Belcan Engineering Group, Inc.* (1997), 119 Ohio App.3d 435, 695 N.E.2d 783.

**5.** *Kerans, supra.*

**6.** *Hart v. Justarr Corp.* (1994), 98 Ohio App.3d 673, 676, 649 N.E.2d 316, 318.

**7.** *Hart, supra,* at 676–677, 649 N.E.2d at 318–319.

director could be held liable, in his individual capacity, for failing to take action against known harassment.[8]

■ Thus, this court has recognized that a person may be held directly liable, in his individual capacity, for a failure to take appropriate action with respect to sexually harassing conduct.

### 3. HUNKAR'S INDIVIDUAL LIABILITY

Neither *Kerans* nor *Hart* dealt with the issue of when "a harasser can be held liable in his individual capacity" for his own harassing conduct, which is a focal point of Wille's argument here. *Kerans* held that a corporate employer can be liable for its own negligence for failing to prevent or correct the harassment of another. *Hart* held that an individual may qualify as an employer and may be held liable for the type of negligence recognized in *Kerans*. Both cases, to the extent that they recognized a tort claim for sexual harassment, recognized that a tort claim may be brought against an *employer* for its own negligence in dealing with a harasser.

■ In this case, Wille contends that Hunkar should be held individually liable in tort for *his own* sexual harassment. Individual liability was recognized in *Hart*, but only when the individual met the definition of "employer." Thus, the first issue we address is whether Hunkar is an employer within the meaning of R.C. Chapter 4112 and therefore subject to individual liability.

R.C. 4112.01(A)(2) defines an "employer" to include "the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer." The definition of "person" under R.C. Chapter 4112 "includes one or more individuals, partnerships, associations, organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and other organized groups of persons." R.C. 4112.01(A)(1). Thus, as this court found in *Hart*, an individual can be an "employer."

In *Hart*, this court held that authority and power to "employ, retain, and dismiss" the employee-harasser was sufficient to show that the individual was an "employer." The facts here, construed in favor of Wille, demonstrate that Hunkar was more than a supervisor or officer of the company; he *was* the company. He was president, CEO, and chairman of the board of the corporation at the time the harassing conduct occurred. Hunkar controlled the company's day-to-day operations as well. He had unfettered authority and power to "employ, retain, and dismiss" employees. There was no one above him in the

---

8. *Hart, supra,* at 677–678, 649 N.E.2d at 319.

hierarchy, and he had final authority for day-to-day management decisions. Pursuant to the foregoing analysis, an issue of fact exists as to whether Hunkar had authority and power to "employ, retain, and dismiss" employees and so meets the definition of "employer" under Ohio law.

If Hunkar is an employer, *Hart* supports the conclusion that Hunkar can be held directly liable for his own negligence in failing to prevent or correct the harassing conduct of other employees, such as Fricke, if Wille can show that Hunkar knew or had reason to know of the harassing conduct.

Further, we hold that Hunkar can also be individually liable for *his own* harassing conduct. R.C. 4112.02 states:

"It shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment * * *."

R.C. 4112.99 states that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." Because Hunkar may be an "employer," he is subject, in his individual capacity, to a civil action for damages based on his conduct if Wille can prove that his conduct constituted unlawful sexual harassment. We emphasize that by holding that Hunkar can be individually liable for his own harassment, we are not holding that any person who sexually harasses another can always be subject to individual liability for his or her own acts pursuant to R.C. Chapter 4112. Rather, Hunkar's individual liability in this case stems from the fact that he falls within the definition of an employer and is therefore explicitly subject to liability for harassment.

Accordingly, Wille's first assignment of error is sustained.

## B. SECOND ASSIGNMENT OF ERROR

In her second assignment of error, Wille asserts that the lower court erred by granting summary judgment to HLI on her sexual-harassment claim. We agree.

In granting summary judgment, the lower court relied on the reasoning in *Kauffman v. Allied Signal, Inc.*[9] and held that HLI could not be held liable for Fricke's harassment because the company had no knowledge of his conduct. Wille admits that she did not complain to anyone at the company until shortly before she quit her employment, and HLI claims to have taken prompt action to remedy the situation once it learned of it. We hold that the lower court erred in

---

9. *Kauffman v. Allied Signal, Inc.* (C.A.6, 1992), 970 F.2d 178.

granting summary judgment on the basis of this evidence, since HLI may be held vicariously liable for Fricke's conduct even if it had no actual knowledge of it, and because, in any event, there is evidence in the record that HLI actually had knowledge of Hunkar's conduct.

On April 22, 1998, the Supreme Court of the United States released two cases that are instructive on the disposition of this assignment, *Burlington Industries, Inc. v. Ellerth* [10] and *Faragher v. Boca Raton,* [11] both of which substantially revise the relevant inquiry into supervisory liability from that adopted in *Kauffman v. Allied Signal,* upon which the trial court relied. In *Burlington Industries,* the plaintiff, Kimberly Ellerth, resigned from her job as a salesperson with Burlington Industries after only fifteen months of work. She claimed that she felt forced to quit because she was subjected to constant sexual harassment by one of her supervisors, Ted Slowik.

Even though she knew that Burlington had a policy against sexual harassment, Ellerth did not report Slowik's conduct to anyone in authority. After quitting her job, Ellerth filed suit under Title VII, claiming that Burlington was liable for Slowik's sexual harassment and that her resignation due to the harassment constituted a constructive discharge.

The district court granted Burlington's motion for summary judgment on the grounds that the employer had no actual knowledge of the harassment, but the Seventh Circuit Court of Appeals, sitting *en banc,* reversed in a judgment that yielded eight separate opinions, but no consensus. That judgment was appealed to the United States Supreme Court.

In *Faragher v. Boca Raton,* the plaintiff, Beth Faragher, worked as a lifeguard for the Marine Safety Division of the Parks and Recreation Department of Boca Raton for five summers between 1985 and 1990. Her immediate supervisors were Bill Terry, David Silverman, and Robert Gordon. Faragher resigned in June 1990, and, in 1992, she sued Terry, Silverman, and the city, alleging that Terry and Silverman had subjected her and other female lifeguards to a sexually hostile atmosphere by uninvited and offensive touching, and lewd, offensive, and degrading remarks about them and women in general.

In 1986, the city had implemented a policy against sexual harassment, but it failed to disseminate the policy to the marine safety division, and Terry, Silverman, Gordon, and Faragher were all unaware of it. Faragher did not complain about Terry and Silverman to higher authorities, but she did discuss their behavior with Gordon. Other female lifeguards also complained to Gordon, but

---

10. *Burlington Industries, Inc. v. Ellerth* (1998), 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633.

11. *Faragher v. Boca Raton* (1998), 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662.

he stated that he did not feel that it was his place to report these complaints to Terry, his superior, or to any higher authority in the city.

The district court held that the city was vicariously liable for the harassment, but the court of appeals reversed. Although the harassment was severe and pervasive enough to constitute a hostile environment, the court of appeals held that Terry and Silverman were acting outside the scope of their employment when they harassed the female employees, that they were not aided in their conduct by their agency relation to the city, and that the city could not be charged with constructive knowledge of the harassment despite its pervasiveness and Gordon's actual knowledge. The United States Supreme Court then granted Faragher's petition for a writ of certiorari.

In both *Burlington Industries* and *Faragher*, the court concluded that the employer could be held vicariously liable for the harasser's conduct. Rejecting the rationale that lack of actual knowledge of harassment insulates an employer from liability for a supervisor's harassment and that harassment is always outside the scope of employment and therefore not attributable to the employer, the court held:

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence * * *. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[12]

The employer's lack of knowledge, therefore, does not preclude the imposition of liability unless the employer establishes the elements of the affirmative defense. Likewise, an employer cannot insulate itself from liability for a supervisor's harassment by claiming that the supervisor was acting outside the scope of his employment. Based on the reasoning in *Burlington Industries* and *Faragher*, we hold that genuine issues of material fact remain to be litigated as to HLI's liability for the actions of Fricke and Hunkar.

First, genuine issues of fact exist as to whether Fricke was Wille's supervisor. While HLI maintains that he was a sales representative, the same position held

---

**12.** *Burlington Industries, supra,* 524 U.S. at 765, 118 S.Ct. at 2270, 141 L.Ed.2d at 655; *Faragher, supra,* 524 U.S. at 807, 118 S.Ct. at 2292–2293, 141 L.Ed.2d at 689.

by Wille, the record demonstrates that reasonable minds could come to another conclusion. He was the most senior sales representative, and he was Hunkar's cousin. Wille was required to travel with and observe Fricke as part of her training. Thus, there is an issue of fact as to whether the standard for supervisory liability applies to Wille's claims in this case.

Second, if the supervisory-liability standards apply, HLI's alleged lack of knowledge of Fricke's conduct and the alleged reprimand given to Fricke after Wille's attorney contacted HLI do not insulate HLI from liability for Fricke's harassment. As the United State Supreme Court has indicated, lack of knowledge or the taking of remedial action does not *automatically* preclude imposition of vicarious liability.

Prior to the June 1996 letter from Wille's counsel, HLI had neither .a policy against sexual harassment nor any preventive or corrective procedures available for harassed employees such as Wille. When Wille did complain about the conduct of Fricke and Hunkar to her immediate supervisor, she was told that he could not do anything about Hunkar's conduct, since Hunkar was president and chief operating officer of HLI.

Thus, HLI cannot insulate itself from liability for Fricke's harassing conduct by claiming that it had no knowledge of the harassment, when it failed to provide any method or avenue for an employee to use to make complaints.

Further, Hunkar was president, CEO, and chairman of the board of the corporation and acted as a supervisor or manager of his employees on a daily basis. HLI cannot be said to have been ignorant of Hunkar's conduct. This is akin to saying that Hunkar was unaware of his own conduct. The issue is whether HLI, the entity, was aware or should have been aware of the conduct of Hunkar, the individual. Ordinarily, an entity's knowledge of one of its employee's actions must be established by showing that an individual, such as a supervisor, acting as an agent of the corporation, had knowledge of the actions. Here there is no need for this roundabout analysis because Hunkar was the corporation, and he may be charged with knowledge of his own conduct.

Reviewing the evidence in this case, we hold that a genuine issue of material fact exists as to whether Fricke's conduct, Hunkar's conduct, and the general atmosphere at HLI were severe and pervasive enough to alter Wille's working conditions. We set forth above the numerous instances of harassment, derogatory jokes, and references to and pictures of women that occurred on a regular basis at HLI. Much of the harassment had a direct impact on Wille's ability to perform her job. The demeaning statements by Fricke and Hunkar to HLI's customers insinuating that Wille's only value to the company was her body undermined Wille's ability to do her job in a way that no male employee had to

endure. The derogatory references to females in sales meeting, such as the screen savers and Hunkar's statement that the "aggressive dog gets to screw all the bitches," emphasized to Wille's co-workers that women were not equals, but objects.

Based on the evidence presented to the trial court, construed most strongly in Wille's favor, we hold that genuine issues of material fact exist as to whether Wille was subjected to a sexually hostile work environment. Genuine issues of material fact also exist regarding HLI's and Hunkar's liability for the harassment.

Accordingly, Wille's second assignment of error is sustained.

## C. THIRD ASSIGNMENT OF ERROR

Wille's third assignment of error assails the lower court's granting of summary judgment to the defendants on her constructive-discharge claim. We agree.

In order to prove a claim of constructive discharge, Wille must demonstrate that the defendants' actions were such that her working conditions were so intolerable that a reasonable person under such circumstances would have felt compelled to resign.[13] Wille argues that the two years of sexual harassment she endured, coupled with the defendants' conduct after receipt of her counsel's letter, were so intolerable that she was forced to quit and therefore was constructively discharged.

In addition to the evidence concerning the duration of the harassment, Wille produced evidence that, after her attorney wrote to HLI, Hunkar excluded her from necessary training sessions, berated her in front of her co-workers for bringing her claims against the company, and told her that no one wanted to work with her. In holding that Wille failed to present evidence that a reasonable person would have felt forced to resign under the circumstances, the trial court did not consider the evidence of the two years of sexual harassment, because it found that HLI had taken steps to correct the harassing conduct. The trial court failed to mention anything about the allegations of retaliation by Hunkar, including Wille's belief that he berated her for bringing her claims and excluded her from important sales meetings. The lower court did consider Wille's allegations that Hunkar had made her continued employment contingent upon the dropping of her claims, but held that no evidence supported her belief, and that,

---

13. *Mauzy v. Kelly Services* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272, paragraph four of the syllabus.

in any event, her subjective belief was insufficient to support a claim of constructive discharge.

■ We are convinced that the trial court erred in failing to consider all of the circumstances of Wille's employment in determining whether Wille's working conditions were so intolerable that a reasonable person would have felt compelled to resign. First, as indicated above, the issue is whether "the *cumulative* effect of the employer's actions would make a reasonable person believe that termination was imminent."[14] (Emphasis added.) The trial court should have analyzed Wille's constructive-discharge claim by considering all of the facts and circumstances of Wille's employment, including the sexual harassment and Hunkar's conduct after receiving Wille's counsel's reports about the harassment.[15]

Second, the trial court's reference to Wille's unsupported, purely subjective belief that she could not continue to work at HLI unless she dropped her claims is contradicted by Hunkar's own deposition testimony. Hunkar stated in his deposition that he believed that the employees at HLI were angry with Wille for bringing claims against the company (although no employee ever told him that), and that he offered Wille a "package" deal that he felt would enable her to "remain at [the] company." This deal encompassed a change in her position and mandated some sort of resolution of her claims that would be tantamount to a retraction of her allegations. Hunkar felt that, without this deal, Wille would not be able to remain at the company, because, in his estimation, the other employees would remain angry at her for bringing the claims.

Thus, the evidence raises at least a genuine issue of fact regarding the likelihood of Wille's future employment with the company if she refused to drop her claims. Because the trial court simply failed to consider all of the relevant factors in reaching its conclusion on Wille's constructive-discharge claim, we sustain Wille's third assignment of error.

## D. FOURTH ASSIGNMENT OF ERROR

■ In her fourth assignment of error, Wille asserts that the lower court erred by granting summary judgment to the defendants on her retaliation claim. The assignment has merit.

■ In order to state a claim of retaliation, Wille must demonstrate that (1) she engaged in a protected activity, (2) HLI knew of her participation in the

---

14. *Mauzy* at 589, 664 N.E.2d at 1281.

15. See *Chapman v. Adia Serv., Inc.* (1997), 116 Ohio App.3d 534, 545, 688 N.E.2d 604, 611 (reduction in sales territory, poor performance evaluations, and criticism in front of coemployees may constitute constructive discharge).

protected activity, (3) HLI engaged in retaliatory conduct, and (4) the alleged retaliatory action followed Wille's protected activity sufficiently close in time to warrant the inference of retaliatory motivation.[16] Wille's allegations in support of her retaliation claim are essentially the same as those in support of her constructive-discharge claim.

Indisputably, Wille's pursuit of her sexual-harassment claims against the defendants constituted activity protected by state and federal law. Wille alleges that the following conduct was retaliatory: she was excluded from sales meetings, Hunkar criticized her in front of other employees and told her no one wanted to work with her, and she was constructively discharged.

Not all conduct undertaken in reaction to an employee's protected activity constitutes an "adverse action" under either Ohio or federal law. Title VII defines an adverse action as "any action which already has impaired or which might impair the employee in future employment situations."[17] Although the adverse conduct does not have to rise to a level of pecuniary loss, the conduct must still materially affect the terms and conditions of employment.[18] Being treated differently from other employees because of protected conduct may be an adverse action,[19] and, as the lower court noted, so may constructive discharge. We have already determined that summary judgment was improper on Wille's constructive-discharge claim.

Wille's exclusion from sales meetings that directly affected her ability to perform her job and her constructive discharge were both adverse actions. These acts occurred almost immediately following the company's receipt of Wille's counsel's letter. Hunkar's anger at Wille, his criticism of her in front of her co-workers, and his attempts to get her to drop her claims against the corporation did not themselves constitute adverse action as that term has been understood in discrimination law. However, that conduct was expressly linked to Wille's protected activity and is evidence of a causal link between the adverse action taken against Wille and her protected conduct. In light of the short temporal proximity between the adverse actions and her protected activity, we hold that Wille has presented sufficient evidence to withstand summary judgment by raising genuine issues of material fact with regard to her claim of retaliation.

Wille's fourth assignment of error is sustained.

---

**16.** See, *e.g., Neal v. Hamilton Cty.* (1993), 87 Ohio App.3d 670, 622 N.E.2d 1130, jurisdictional motion overruled, (1993), 67 Ohio St.3d 1481, 620 N.E.2d 854.

**17.** See *Clark v. Pennsylvania* (E.D.Pa.1995), 885 F.Supp. 694, 709–710.

**18.** See *Kocsis v. Multi–Care Mgt.* (C.A.6, 1996), 97 F.3d 876, 885.

**19.** See *Penny v. UPS* (C.A.6, 1997), 128 F.3d 408, 417.

### E. FIFTH ASSIGNMENT OF ERROR

In her fifth, and final, assignment of error, Wille contends that the lower court erred by denying her motion for leave to amend her complaint in order to set forth a claim that the defendants retaliated and constructively discharged her for consulting an attorney. We overrule this assignment of error.

Ohio courts have held that "[a]mendment of pleadings by leave of court, Civ.R. 15(A), is a matter of judicial discretion." [20] A denial of leave to amend a complaint will not be disturbed on appeal without a showing of an abuse of discretion, which "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." [21]

Here, Wille filed her second motion to amend her complaint only twenty-one days prior to the day the case was set for trial. We hold that the denial of the motion did not reflect an unreasonable, arbitrary, or unconscionable attitude on the part of the lower court. Accordingly, the fifth assignment of error is overruled.

### V. CONCLUSION

We sustain Wille's first, second, third, and fourth assignments of error, and we overrule her fifth assignment. The judgment of the court of common pleas is reversed, and this cause is remanded for further proceedings consistent with this opinion and law.

*Judgment reversed*
*and cause remanded.*

SUNDERMANN, P.J., concurs.

GORMAN, J., dissents.

GORMAN, Judge, dissenting.

No one should be forced to endure sexual harassment to earn a living. But Wille's silence for two years, coupled with her abrupt departure from her employer in the midst of policy changes resulting from meetings between Wille, her lawyer, and Hunkar, distinguishes this case from the usual hostile-environment claim.

---

**20.** *State ex rel. Wargo v. Price* (1978), 56 Ohio St.2d 65, 66, 10 O.O.3d 116, 116, 381 N.E.2d 943, 943.

**21.** *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

The evidentiary materials in the record are conclusive and the majority's analysis seems to concede that there was no tangible adverse employment action taken against Wille. Accordingly, her hostile-environment claim against her employer is not determined by a strict-liability standard. As the majority correctly concludes, Wille's claim, under R.C. Chapter 4112, that she was sexually harassed by her supervisor, Fricke, if proven, imputes liability to her employer pursuant to principles of vicarious liability. *Burlington Industries, Inc. v. Ellerth; Faragher v. Boca Raton.* Neither the trial court nor counsel, however, had the benefit of *Ellerth* and *Faragher* when summary judgment was granted for the corporate employer.

Pursuant to Civ.R. 56, I agree with the majority that Wille's allegations, reviewed in their most favorable light, present genuine issues of material fact that the alleged behavior was based on sex and was unwelcome. I question, however, whether, under a reasonable-person standard, the eight instances of harassment over two years specifically identified by the majority—six verbal and two involving touching—are severe and pervasive enough to establish a hostile-environment claim under *Meritor Sav. Bank FSB v. Vinson.*[22] In *Sprague v. Thorn Americas, Inc.,*[23] for example, five sexual incidents over sixteen months was not deemed sufficiently severe and pervasive so as to create a hostile environment.

The essence of Wille's claim is that her supervisor's acts created an abusive working environment.[24] In her deposition, however, she admitted she always performed her job well, never missed a day of work or took sick leave, and never complained to her employer until six weeks before she quit.[25]

Even if it is assumed, as the majority contends, that the record raises genuine issues of material fact to satisfy a *prima facie* case of supervisor sexual harassment under *Ellerth* and *Faragher,* Wille's employer is still entitled to summary judgment because, as a matter of law, it must prevail on its affirmative defense. "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advan-

---

22. *Meritor Sav. Bank FSB v. Vinson* (1986), 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 59–60.

23. *Sprague v. Thorn Americas, Inc.* (C.A.10, 1997), 129 F.3d 1355.

24. See, *e.g., Delaney v. Skyline Lodge, Inc.* (1994), 95 Ohio App.3d 264, 642 N.E.2d 395.

25. See *Jones v. Clinton* (E.D.Ark.1998), 990 F.Supp. 657, 675.

tage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." [26]

Here, the corporate employer did not have a formal policy on sexual harassment. This fact is not dispositive of whether it failed to exercise reasonable care to prevent and correct promptly sexually harassing behavior. The *Faragher* court observed that small employers may comply with less formal procedures.[27] Here, the company had twenty-seven employees. It is undisputed that the corporate president and CEO, Denes Hunkar, had an open-door policy and encouraged employees to come to him with their problems. Unlike the grievance procedure in *Faragher*, Hunkar's open-door policy allowed an employee to bypass the harassing supervisor to complain.

Immediately after Wille complained, Hunkar notified the board of directors. Two days after receiving the letter of June 25, 1996 from Wille's attorney outlining her complaints, he ordered the "broken cherry award" discontinued and its display in the office banned. Hunkar arranged a meeting at which he and the company's attorney addressed Wille's concerns with Wille and her attorney. Following the meeting, he conducted an investigation and ultimately reprimanded Fricke. With the assistance of Wille and her attorney, the company established a formal sexual-harassment policy and required company employees to attend a video program on sexual harassment. Whenever she felt uncomfortable, Wille was to notify the company's inside sales manager, Jeannie Martin, or her own attorney. This procedure was acceptable to Wille. Although she conceded in her deposition that there was no further sexual harassment after she initially complained to her immediate supervisor, Charles Koehler, she, nevertheless, tendered her resignation thirty-three days after the initial June 27, 1996 meeting.

The employer's open-door policy provided a reasonable means to prevent and to correct promptly any sexual harassment. Wille did not take advantage of it for two years. Then she summoned her lawyer to deliver her complaints. After the company developed a new policy with the assistance of Wille and her lawyer, she resigned even though she experienced no other incidents of sexual harassment. In view of her decision to use her lawyer as her messenger, it is now disingenuous for Wille to maintain that Hunkar's open-door policy was ineffective because he was also a harasser. The company suggests that she tired of sales and opted for a career move to her personal-training and fitness business. In my view there is no genuine issue of material fact remaining that precludes the entry

---

**26.** *Burlington Industries,* 524 U.S. at 765, 118 S.Ct. at 2270, 141 L.Ed.2d at 655; *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293, 141 L.Ed.2d at 689.

**27.** *Faragher* at 807–809, 118 S.Ct. at 2293, 141 L.Ed.2d at 688–690.

of judgment. Wille unreasonably failed to take advantage of any preventive or corrective opportunities.

I also disagree with the majority that Hunkar, as president and CEO of the corporation, can be individually liable for a common-law *Kerans* tort. The rule in *Kerans* is based upon the employer's failure to provide a safe workplace, rendering the employer liable in tort where the employer knew or should have known of the supervisor's past history of behavior involving sexual harassment. It is a claim against the employer and not the harasser. To create a claim of individual liability by means of a *Kerans* tort requires reference to the statutory definition of "employer" in R.C. 4112.01(A)(1), since *Kerans* does not mention individual liability.[28]

To determine if a *prima facie* case of discrimination has been established under R.C. Chapter 4112, the Ohio Supreme Court has directed inferior courts to look to federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) *et seq.*, Title 42, U.S.Code.[29] Although individual liability of the harasser may be appropriate under other state tort claims, the majority of federal courts, including the Sixth Circuit Court of Appeals, have held that Title VII does not provide for a claim of individual liability.[30] The majority cites our decision in *Hart v. Justarr*, which recognized in reliance on *Seiber* the individual liability of a supervisor who knew of the harassment. I am persuaded that both cases have been superseded by the later federal precedents.

The issue of whether a supervisor can be jointly and severally liable with his employer for behavior in violation of R.C. Chapter 4112 is currently under consideration by the Ohio Supreme Court.[31] In the absence of guidance to the contrary from the Ohio Supreme Court, we ought to follow federal case law and not permit an individual-liability claim.

Therefore, I respectfully dissent.

---

28. *Seiber v. Wilder* (Oct. 12, 1994), Greene App. No. 94 CA 32, unreported, 1994 WL 558969.

29. *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 582, 664 N.E.2d 1272, 1276; see, also, *Weiper v. W.A. Hill & Assoc.* (1995), 104 Ohio App.3d 250, 264, 661 N.E.2d 796, 805; *Murray v. Mount Washington Care Center* (Dec. 26, 1997), Hamilton App. Nos. C–960654 and C–960664, unreported, 1997 WL 789716.

30. *Wathen v. General Electric Co.* (C.A.6, 1997), 115 F.3d 400.

31. See *Genaro v. Cent. Transport, Inc.* (1997), 80 Ohio St.3d 1412, 684 N.E.2d 705, and (1999), 84 Ohio St.3d 293, 703 N.E.2d 782.