OPINION
Sheila W. Goad, plaintiff-appellant, appeals a decision of the Franklin County Court of Common Pleas. The trial court granted a motion for summary judgment filed by defendants-appellees Sterling Commerce, Inc. ("Sterling"), David W. Pond, and Paul L. H. Olson. We affirm.
In September 1981, appellant began working as a computer programmer for Informatics General Corporation; Sterling later acquired Informatics. In 1991, Pond promoted appellant to the position of Director of EC Solutions Center for Sterling. As part of her responsibilities, appellant reported to Pond, who at the time was a vice-president at Sterling. Olson was the President of the Commerce Services Group for Sterling and Pond reported to Olson. Appellant stated in her deposition that from 1991 to 1997, her title and compensation stayed the same despite the fact that her responsibilities as a director shifted several times.
In June 1996, Dave Goldsmith was hired as a director at Sterling. Goldsmith was placed between appellant and Pond so appellant began reporting to Goldsmith, and Goldsmith reported to Pond. Appellant stated in her deposition that after Goldsmith was hired, some of her responsibilities "began to be eroded." Appellant also claimed that: (1) she was no longer privy to information to which she had previously been privy; (2) she was no longer required to attend certain meetings with Pond; and (3) Goldsmith was given the responsibility of preparing the budget. Because of budget cuts made by Goldsmith, appellant had fewer people in her department. Appellant also stated that despite the changes, Goldsmith "totally left me alone" to run the department. During this time, appellant's title as Director of EC Solutions Center did not change, her salary increased, and she was awarded stock options.
As to the reason why Goldsmith was hired, Pond testified in his deposition concerning the events prior to Goldsmith being hired:
 [T]he working relationship [appellant] had with the sales organization was deteriorating. It was deteriorating to the point where sales would ask [appellant] to build work product such as templates and maps that sales didn't even need but they were just trying to get into the que because they didn't feel that [appellant] would respond when they needed them.
 As a result of that roughly half the templates we had built were not distributed to customers and that business problem was created by the working relationship that [appellant] had with the sales organization.
Later, in November 1996, appellant's responsibilities for the "Commerce Forms" were switched to Greg Duncan. Because of the switch, some of the people that had reported to appellant now reported to Duncan. However, appellant's title and salary remained the same.
In April 1997, appellant began to investigate the possibility of moving from Columbus, Ohio to Hilton Head, South Carolina. No evidence was presented to show Sterling had any employees living in Hilton Head or any places of employment located there. Appellant contacted a business broker to investigate business opportunities in the Hilton Head area. Also in April 1997, appellant's husband, David Goad, became eligible for retirement. Appellant's husband, who worked in a different department than appellant, was also an employee of Sterling.
In May 1997, appellant and her husband listed their house in Columbus for sale with a real estate agent. Appellant stated in her deposition that even though they had listed their house for sale in May 1997, they had not decided at that time to move and were only "exploring" whether they were going to move. Appellant also stated in her deposition that her husband decided to retire in May or June of 1997. Appellant and her husband again traveled to Hilton Head in June 1997. During this trip, they began looking at houses to rent in the Hilton Head area. They eventually signed a lease to rent a home in Hilton Head in July 1997. Appellant's husband retired from Sterling at the end of July 1997. Appellant stated in her deposition that they had planned "for a number of years to retire together to Hilton Head."
In early May 1997, appellant had lunch with Goldsmith and inquired about a severance package from Sterling because "it seemed that I didn't have any opportunity at Sterling, that I was being excluded from things, and that if Sterling was trying to get rid of me, that I was open to pursuing something else." Appellant stated in her deposition that Goldsmith "was quite surprised and said to his knowledge the Company was not trying to get rid of me, and that as far as he was concerned, I was doing an excellent job and was a very competent person." She also stated in her deposition that a few days after she talked to Goldsmith, Pond left a telephone voice mail message saying that "Goldsmith had shared our conversation at lunch and that he wanted to reassure me that I was doing an excellent job, and that he had no * * * plan to get rid of me." Appellant stated in her brief that "[t]his late night voice mail message to a long time employee did not make [her] feel at all valuable or wanted in the organization."
Soon afterwards, Goldsmith told appellant about a reorganization within Sterling that would be taking place shortly. Part of the reorganization consisted of appellant's department combining with the sales department. Appellant stated in her deposition that even though her department was going to be moved, her impression was that the change in organization "was going to result in a better, more challenging job position" with more opportunity for her.
On May 22, 1997, appellant inadvertently sent an e-mail to Goldsmith instead of to her husband, as intended. The e-mail included an attached letter to Allen Cauble, a home builder in the Hilton Head area, detailing things she and her husband "especially like about our current house" and things "we would like in our new house." Appellant ended the letter by stating that she looked forward to working with Cauble.
On June 28, 1997, a memorandum was released by Pond to some of Sterling's management. The memo stated in part:
 In order to keep pace with the explosive growth of Sterling Commerce, NSG Labs is making the following organizational changes that are effective immediately.
 On July 1, David Goldsmith will be joining Sterling Commerce as Director of EC Application Services, reporting to me. In this new role, David will have responsibility for the EC Solution Center, EC Managed Services Technical Application Integration, and Infrastructure Systems. Expanding on her current role as Director of the EC Solution Center, [appellant] will assume an assignment to launch a new team that will provide technical application integration for EC Managed Services.
Appellant was placed in the position of Special Projects Director on July 1, 1997. With her new position, she remained a director and her pay remained the same. Appellant stated in her deposition that some of the responsibilities of her new position included duties she had previously been doing.Appellant testified that she did not want to do some of the responsibilities that she was assigned to do because, she "felt that it was somebody else's turn." For example, appellant stated that she was put in charge of Sterling's "quality program," a responsibility she had before the change. Appellant testified that she did not want to be in charge of the quality program because "the person that's in charge of the quality program * * * would win an unpopularity contest." Appellant contended in her deposition that since her new responsibilities entailed "things I did not want to do," delegating those responsibilities to her "was saying we want to make it miserable so you'll leave." She also stated that when she talked to Pond about her new responsibilities, he told her that they included "things you don't want to do, and [Olson]expects you to be gone by the end of the year."
Appellant claimed that she knew that she had been constructively discharged "as soon as I found out that I had no reports * * * that I was going to be given assignments that I didn't want to do * * * [a]nd that I * * * wasn't expected to be there by the end of the year." When asked what was so intolerable about her new position that required her to quit, appellant answered:
 The accounting job was no challenge. * * * And the job was to try to find mistakes in other people's work, and then when you found the mistake, you had to go point it out to the person; so it was a bad guy. There was no reward for it. And I'd been doing it for a couple of years and I was, you know, any challenge there was in learning how to read the financials; I already knew how to do that.
On July 28, 1997, appellant filed a complaint against appellees alleging that she had been constructively terminated because she was "demoted to a special projects position in an effort to constructively terminate her." Also on July 28, 1997, appellant presented a letter to Pond that stated:
 Please consider this letter as my acknowledgement of my constructive termination by Sterling Commerce through my demotion, the removal of all my reports, your intention to assign me special projects which you indicated were ones that you knew that I did not want to work on, and your statement that Paul (Olson) did not expect me to be at Sterling in 6 months.
 Since I will be completing my sabbatical and taking my remaining accrued vacation time, I will not be returning to the office and my constructive termination will be effective on September 5, 1997.
Appellant also used Sterling's e-mail system that day to send a message titled "A Farewell from the Heart" to one hundred two employees, which stated in part:
 * * * After 16 years with Sterling Commerce (and its predecessors) and a performance record that most would view as quite positive, Sterling Commerce has decided that they do not have a place for me in the organization.
* * *
 [Appellant and her husband] will be moving to Hilton Head Island, South Carolina, our paradise, to pursue a new dream and new opportunities. We are both very scared and very excited about this major life change.
In the e-mail, appellant included her new e-mail address, which included the name "Shandago." Appellant and her husband formed a business named Shandago Incorporated sometime in the summer of 1997 prior to moving to Hilton Head.
In a letter to appellant dated July 30, 1997, Richard Needles, Vice-President of Human Resources at Sterling, stated:
 I have received your letter dated July 28, 1997. Let me state clearly that your employment was not terminated by Sterling Commerce, constructively or otherwise, and Sterling Commerce does not accept your letter as an acknowledgement thereof. Sterling Commerce does, however, accept your letter as a voluntary resignation of your position effective July 28.
 I should note that it is against our policy and practice to allow employees to take sabbatical leave as their last day(s) of employment. You were approved for sabbatical leave from July 7 until August 4, 1997. Your letter has clearly interrupted this approved leave period. We will not try to stop your pay retroactive to July 7; however, we will consider your resignation effective July 28, 1997. This date will be the effective date for our personnel and payroll records. Per our policy, you will be paid through July 28 and then paid for any unused, accrued vacation. You will not be paid for any remaining sabbatical time.
* * *
 Sheila, I also want to reinforce that your use of our e-mail system to send a message to 102 of our employees on July 28 was entirely inappropriate. This message appears to have been sent after you submitted your resignation. Your use of our e-mail system for personal reasons was clearly a violation of our e-mail policy, especially after your resignation.
 Sterling Commerce sincerely regrets that you have chosen to resign in such an inappropriate manner. However, we accept your resignation.
Appellant and her husband moved to Hilton Head, South Carolina in August 1997. They attempted to purchase a store named The Paper Company in August 1997. They learned about The Paper Company through a Hilton Head business broker appellant had contacted in April 1997. Appellant stated in her deposition that she and her husband had also explored other businesses that were for sale including a flower shop, a Scandinavian furniture store, a jewelry store, an outdoor furniture store, and a sweet shop. Appellant further stated that none of the businesses they looked into were in the same line or field as Sterling. Eventually, appellant and her husband began operating a small retail store called "Paper Party Plantation" located in Hilton Head, in November of 1997. The store is a retail store that sells stationary, invitations, party goods, and gift items.
In her complaint filed on July 28, 1997, appellant alleged that she had been "subjected to a pattern and practice of sex discrimination and has been demoted and constructively discharged in her employment by [appellees]." Appellant requested "compensatory and punitive damages, including damages for emotional distress, her benefits, stock options and retirement benefits, and attorney's fees, pursuant to R.C. Sections4112.02(A) and 4112.99 in the sum of $8,750,000 plus interest." In an amended complaint filed on August 6, 1997, appellant also claimed that her:
 * * * employment was abruptly terminated, her pay and benefits halted and she was rebuked in writing for sending a farewell message to other employees in retaliation for her filing suit against Sterling, in violation of R.C. 4112.02(I) and 4112.99 and in violation of public policy, for which she seeks compensatory and punitive damages, including damages for emotional distress and attorney's fees in the sum of $3,500,000.
Appellant also stated in her deposition that the $3,500,000 figure was based upon emotional distress and punitive damages caused by the letter from Richard Needles regarding her use of Sterling's e-mail system after she had resigned and because Sterling withheld seven days worth of sabbatical pay.
On December 1, 1998, appellees filed a motion for summary judgment. In a well-written decision dated March 2, 1999, the trial court sustained appellees' motion for summary judgment. The court found that appellant failed to establish sufficient evidence to show that she was constructively discharged. The court also found that appellant failed to establish that appellees' termination of her pay and benefits was retaliatory. Appellant appeals the trial court's decision and presents the following two assignments of error:
 I. THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF'S CLAIMS OF SEX DISCRIMINATION AND RETALIATION.
 II. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER DAMAGE CLAIMS FOR FRONT AND BACK PAY AND EMOTIONAL DISTRESS.
Appellant argues in her first assignment of error that the trial court erred in granting appellees' motion for summary judgment for her sex discrimination and retaliation claims. Her claim of sex discrimination is based upon: (1) being demoted in June 1996 when Goldsmith was hired as Director of EC Application Services; (2) being demoted in May 1997 when her position as Director of EC Solutions Center was eliminated; and (3) being constructively discharged after she was placed in the position of Director of Special Projects. Her retaliation claim is based upon appellees terminating her pay and benefits after she filed a sex discrimination complaint. We will discuss appellant's sex discrimination and retaliation claims in the order that they have been presented.
Pursuant to Civ.R. 56, summary judgment is appropriate when: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. Zivich v. Mentor Soccer Club, Inc. (1998), 82 Ohio St.3d 367,369-370; Gunsorek v. Pingue (Dec. 2, 1999), Franklin App. No. 99AP-62, unreported, discretionary appeal not allowed (2000),88 Ohio St.3d 1478.
Trial courts should award summary judgment with caution, being careful to resolve doubts and construe evidence in favor of the nonmoving party. Welco Industries, Inc. v. AppliedCos. (1993), 67 Ohio St.3d 344, 346. "Even the inferences to be drawn from the underlying facts contained in the evidentiary materials, such as affidavits and depositions, must be construed in a light most favorable to the party opposing the motion."Hannah v. Dayton Power Light Co. (1998), 82 Ohio St.3d 482,485. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." Baker v. TheBuschman Co. (1998), 127 Ohio App.3d 561, 566.
R.C. 4112.02(A) states in part that it shall be an unlawful discriminatory practice for "any employer, because of * * * sex * * * to discharge without just cause * * * or otherwise discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." In order to prevail in an employment discrimination case, the plaintiff must prove discriminatory intent. Mauzy v. Kelly Services, Inc.
(1996), 75 Ohio St.3d 578, 583.
"Discriminatory intent may be proven either directly or indirectly." Gismondi v. MT Mortgage Corp. (Apr. 13, 1999), Franklin App. No. 98AP-584, unreported, discretionary appeal not allowed (1999), 86 Ohio St.3d 1466. "An employer's discriminatory intent may be shown by direct evidence, or it may be inferred from the evidence upon application of the analytical framework established by the United States Supreme Court in [McDonnellDouglas Corp. v. Green (1973), 411 U.S. 792, 93 S.Ct. 1817]."Bucher v. Sibcy Cline, Inc. (Feb. 4, 2000), Hamilton App. No. C-981014, unreported. See, also, Byrnes v. LCI CommunicationHoldings Co. (1996), 77 Ohio St.3d 125, 128.
Direct evidence of discrimination regarding a person who is disabled "would take the form, for example, of an employer telling an employee, `I fired you because you are disabled.'"Smith v. Chrysler Corp. (C.A.6, 1998), 155 F.3d 799, 805. Direct evidence "is generally hard to come by, for it is the rare discriminator that leaves its tracks uncovered." Olive v.Columbia/HCA Healthcare Corp. (Mar. 9, 2000), Cuyahoga App. No. 75249, unreported. A plaintiff may also prove sex discrimination indirectly by demonstrating that: (1) she was a member of a statutorily protected class; (2) that she was discharged; (3) that she was qualified for the position; and (4) that she was replaced by, or that the discharge permitted the retention of, a person not belonging to the protected class. Johnson v. Central State Univ.
(Mar. 7, 2000), Franklin App. No. 99AP-507, unreported, followingMcDonnell Douglas.
Under both the direct and indirect methods of proving discrimination, a plaintiff bears the burden of proving that each employment decision that adversely affected him or her was the product of a discriminatory motive. Jackson v. Johnson ProductsCo., Inc. (C.A.11, 1983), 698 F.2d 1138, 1143. She "must show that she suffered an adverse employment action because of her sex." Adams v. West Publishing Co. (D.Minn. 1993), 812 F. Supp. 925,932, affirmed (1994), 25 F.3d 635; Zelewski v. American Fed.Sav. Bank (D.Minn. 1993), 811 F. Supp. 456, 463. As Ohio Supreme Court explained in Mauzy, supra, at 588:
 There must be a consequential prohibited act. * * * Other actions, such as transfers or promotions, are not prohibited unless they amount to a "discharge." This is a legislative choice that we cannot disturb.
As applied to the present case, R.C. 4112.02(A) itself requires that in order to have a cause of action, appellant must demonstrate that appellee "discharge[d] [her] without just cause * * * or otherwise discriminate[d] against" her in a matter directly or indirectly related to the employee's employment.
In the present case, the two events appellant relies upon to support her claim that appellees discriminated against her because of her sex are: (1) when Goldsmith was hired as Director of EC Application Services in June 1996; and (2) when appellant's position as Director of EC Solutions Center was eliminated in June 1997, and she was placed in the position of Director of Special Projects. A review of all of the evidence shows that appellant did not suffer an adverse employment action by appellee that was so consequential as to amount to a discharge. When Goldsmith was hired as Director of EC Application Services in June 1996, appellant retained her title and her compensation actually increased. When appellant's position as Director of EC Solutions Center was eliminated in June 1997, she remained a director and her compensation remained the same.
Additionally, when interpreting R.C. Chapter 4112, it is appropriate to look at analogous federal cases. Strader v.Johnson (Dec. 22, 1998), Franklin App. No. 98AP-202, unreported, discretionary appeal not allowed (1999), 85 Ohio St.3d 1479. A United States appellate court has stated that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."Kocsis v. Multi-Care Management, Inc. (C.A.6, 1996), 97 F.3d 876,885. Another United States appellate court stated "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that `an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" Smart v. Ball State Univ.
(C.A.7, 1996), 89 F.3d 437, 441, quoting Williams v. Bristol-MyersSquibb Co. (C.A.7, 1996), 85 F.3d 270, 274. "Although we have defined the term broadly, the adverse job action must be `materially' adverse, meaning more than `a mere inconvenience or an alteration of job responsibilities.'" Ribando v. UnitedAirlines, Inc. (C.A.7, 1999), 200 F.3d 507, 510, quoting Crady v.Liberty Nat'l Bank Trust Co. of Ind. (C.A.7, 1993),993 F.2d 132, 136.
However, we note that "[a] transfer accompanied by measurable compensation at a comparable level does not necessarily preclude a finding of constructive discharge." Mauzy, supra, at 589. Therefore, we must also determine whether appellant presented sufficient evidence to show that she was constructively discharged. "The test for determining whether an employee has been constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign."Mauzy, supra, paragraph four of the syllabus. In determining whether there was a constructive discharge, a court must determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. Mauzy,supra, at 589. "`Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast.'" Mayo v. Kenwood Country Club
(Apr. 23, 1999), Hamilton App. No. C-980528, unreported, discretionary appeal not allowed (1999), 86 Ohio St.3d 1467, quoting Garner v. Wal-Mart Stores, Inc. (C.A.11, 1987),807 F.2d 1536, 1539.
The only evidence appellant presented with regard to how "intolerable" her position was at Sterling was that in June of 1997, she was assigned duties she did not want to do. However, most of the responsibilities that she was assigned at that time were responsibilities that she had previously been doing. Additionally, it is unclear how many days appellant actually worked as the Special Projects Director. Appellant began her new position sometime between Friday, June 28, and Tuesday, July 1. She began her previously scheduled sabbatical on Monday, July 7, and the record contains no evidence concerning whether appellant worked during holidays and/or weekends. Therefore, even if appellant worked on the Fourth of July, Saturday July 5 and Sunday July 6, appellant would have been in her position as Special Projects Director for only six days. During her deposition, appellant agreed with the statement that "while on sabbatical [appellant] concluded [she had] been constructively terminated."
Appellant also attempted to support her discrimination claims with her own statistical analysis. Appellant presented evidence showing that Sterling had four presidents, twenty vice-presidents, and twenty-eight directors. She also presented evidence that of those management positions, only seven positions were held by females. However, in order for statistics to be valid, and helpful in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination. Stair v.Phoenix Presentations, Inc. (1996), 116 Ohio App.3d 500, 510. Appellant admitted in her deposition that she did not consider the individual's performance, experience, education, or seniority when she compiled her statistics. Appellant also did not calculate any statistical standard deviations. The only factors appellant took into account with her statistical analysis were the individual's gender and his or her level within the Sterling management organization. Therefore, we agree with the trial court's statement that appellant's "statistical evidence is flawed and it would be erroneous for the Court to rely upon it."
Appellant also argues that appellees discriminated against her because she believed she should have been promoted to a vice-president position. Appellant claims that appellees failure to promote her was part of a "pattern and practice of sex discrimination" which contributed to her being constructively discharged. Appellant stated in her deposition that Olson had "created an environment where women don't have [an] opportunity for advancement." Appellant also presented evidence of other women in the company that she claimed were discriminated against because of their sex.
First, we note that the "mere fact that an employer may have discriminated against other employees, standing alone, is insufficient." Byrnes, supra, at 130. Second, it is important that the judiciary be careful to "not second guess, in a discrimination action brought by an employee, a business judgment by an employer making personnel decisions." McKenzie v. WrightState Univ. (1996), 114 Ohio App.3d 437, 442. In a similar case in which a plaintiff claimed that she resigned because her employer's failure to promote her, "created intolerable work conditions," the appellate court stated "[i]f we were to accept this line of reasoning, every person passed over for a purportedly deserved promotion could bring an illegal discharge suit, and the distinction between the two would be erased." Hartsel v. Keys
(C.A.6, 1996), 87 F.3d 795, 800, certiorari denied (1997),519 U.S. 1055, 117 S.Ct. 683. See, also, Minter v. Cuyahoga Comm.College (Feb. 17, 2000), Cuyahoga App. No. 76707, unreported.
Additionally, we note that the evidence strongly supports a finding that appellees' actions were not the primary reason why appellant chose to resign from Sterling. Before appellant learned of her new responsibilities, she and her husband listed their house in Ohio for sale with a real estate agent; her husband became eligible for retirement from Sterling; they purchased property with the intent of building a home in Hilton Head, South Carolina; they contacted a home builder and began exchanging information with him concerning the type of home they wanted to build; they looked into business opportunities in Hilton Head; and she discussed with Goldsmith the possibility of receiving a severance package. These facts, in conjunction with her statement that she and her husband had planned "for a number of years to retire together to Hilton Head," would seem to indicate that they were going forward with their plans to move to Hilton Head even before she learned of the reorganization.
Appellant also argues that her responsibilities were eroded in an effort to make her resign. Even if we were to find that appellant suffered "a consequential prohibited act" that amounted to a discharge, appellees have presented sufficient evidence to rebut any presumption of discrimination. "If a plaintiff has set forth a prima facie case of gender discrimination, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for terminating plaintiff's employment." Johnson, supra.
Appellees presented evidence that the reason why Goldsmith was placed between Pond and appellant in June 1996, was because "the working relationship [appellant] had with the sales organization was deteriorating." Additionally, it is reasonable for a company to place an employee in a temporary position during a major reorganization if they believe the employee will be leaving the company before long. Therefore, even if appellant's placement in the position of Special Projects Director on July 1, 1997, could be characterized as a temporary position, sufficient evidence was presented to show that appellees believed that appellant would be leaving the company soon: (1) appellant's husband became eligible for retirement in April 1997; (2) appellant discussed a severance package with Goldsmith in May 1997; and (3) appellant inadvertently sent an e-mail on May 22, 1997 to Goldsmith with her "wish list" of items she was interested in if she built a home in Hilton Head.
Accordingly, after having construed the evidence most strongly in favor of appellant, we find that the trial court did not err in granting summary judgment in favor of appellees concerning appellant's sex discrimination claims. The evidence does not support a finding that appellant was demoted, constructively discharged, or suffered an adverse employment action so consequential to amount to a discharge pursuant to R.C.4112.02.
Appellant also presents a claim that appellees retaliated against her because she filed a complaint alleging sex discrimination. In order to establish a prima facie case for retaliation, appellant was required to present sufficient evidence that: (1) appellant was engaged in a protected activity; (2) appellees knew of appellant's participation in the protected activity; and (3) the alleged retaliatory action followed appellant's participation in the protected activity sufficiently close in time to warrant an inference of retaliatory motivation.Payne v. El Siesta Hotel (Apr. 12, 2000), Delaware App. No. 99-CAE-10051, unreported.
The only evidence appellant presents of a retaliatory action by appellees, to support her $3,500,000 claim in damages, is the letter dated July 30, 1997 from Richard Needles, vice-president of Human Resources. In the letter, Needles reproved appellant for her use of Sterling's e-mail system after she resigned from Sterling. Needles also stated that appellant's resignation date was July 28, 1997 instead of August 4, 1997, because "it is against our policy and practice to allow employees to take sabbatical leave as their last day(s) of employment." A review of this evidence shows that appellant presented sufficient evidence to establish a prima facie case for retaliation because: (1) filing a complaint against an employer for discrimination is a protected activity; (2) appellees knew that she had filed a complaint; and (3) the letter was sufficiently close in time to warrant an inference of retaliatory motivation.
However, appellant cannot prevail "if it appears from the evidence that the employer would have made the same decision regardless of the plaintiff's participation in the protected activity." Neal v. Hamilton Cty. (1993), 87 Ohio App.3d 670,678. "Not all conduct undertaken in reaction to an employee's protected activity constitutes an `adverse action.'" Wille v.Hunkar Laboratories, Inc. (1998), 132 Ohio App.3d 92, 108. Appellees presented evidence that the same decisions outlined in the letter from Needles would have taken place even if appellant had not filed her complaint.
Appellees demonstrated that Sterling's policy was to not pay employees for time on sabbatical when the sabbatical is taken at the end of an employee's employment. A copy of Sterling's employee handbook states that "[a] day of sabbatical leave cannot be used as your last day of employment." Additionally, appellant sent her e-mail message after she had resigned from her position with Sterling. Appellant used Sterling's e-mail system to send a personal message criticizing appellees by stating that Sterling "has decided that they do not have a place for me in the organization." A private written reproof for appellant's unauthorized personal use of Sterling's e-mail system does not rise to the level to support a retaliation claim against appellees.
Therefore, after having reviewed the evidence in a light most favorable to appellant, we find that appellees presented sufficient evidence that the same actions detailed in the letter from Needles would have been taken regardless of appellant's participation in the protected activity. Additionally, a review of the record shows that appellant did not present sufficient evidence to rebut appellee's evidence. Accordingly, we find that the trial court did not err in finding that appellant failed to demonstrate a claim for retaliation. Appellant's first assignment of error is overruled.
Appellant argues in her second assignment of error that the trial court erred concerning its decision regarding her damage claims. We do not need to address this issue because we have already found that the trial court did not err in granting summary judgment for appellant's sex discrimination and retaliation claims. Therefore, it is unnecessary to determine whether appellant could receive damages for those claims. Appellant's second assignment of error is rendered moot. See App.R. 12(A)(1)(c).
Accordingly, appellant's first assignment of error is overruled, appellant's second assignment of error is moot, and the judgment of the Franklin County Court of Common Pleas is affirmed.
BOWMAN, P.J., and DESHLER, J., concur.