OPINION
Plaintiffs Pamela Harmon, Crystal Steck, and Sonya Johnson appeal from a summary judgment in favor of their former employer, Defendants, GZK, Inc. ("GZK"), and two individuals, on Plaintiffs' claims for relief alleging hostile work environment sexual harassment, and related claims.
We affirm the judgment of the trial court with respect to Plaintiff Crystal Steck's claims against GZK and Jerry Zink for retaliatory discharge and common law wrongful discharge. We reverse the judgment of the trial court on the Plaintiffs' remaining claims, and remand the cause to the trial court, for the reasons that follow.
 I. FACTUAL BACKGROUND
A. Pamela Harmon's Employment with GZK
Pamela Harmon began working as a shift leader trainee at the Brown Street Lee's Famous Recipe Restaurant, which is owned and operated by GZK, in May 1996. There she worked with a cook named Larry Barrett. Barrett soon began calling Harmon "honey," "baby," and "sweetheart," and asking her to go on a date with him. Harmon was married and found the comments offensive, and repeatedly told Barrett to stop making them.
Over time, Barrett's comments toward Harmon became more sexually explicit and vulgar. Barrett allegedly told Harmon that he would "like to get a piece of [her] ass," that he would like to "stick his penis in [her] ass," that he would like to "have sex with [her] in [her] ass," and that he "bet [she] would like to suck this dick."
Barrett would often say similar things about store customers to Harmon. According to Harmon, on more than one occasion Barrett grabbed Harmon's buttocks, and he often rubbed his whole body against her when passing her, pretending the contact was accidental.
When Manager Pat Malloy was hired in 1996, Harmon attended a meeting that the store held to introduce Malloy. Harmon recalled that Area Supervisor Tony Wilkins and Manager Claire Keeton also attended the meeting. During the meeting, Keeton brought up the offensive comments that Barrett had allegedly made about her breasts. Harmon also spoke about the offensive conduct she endured from Barrett. Harmon told Wilkins that she did not like Barrett's conduct and that Wilkins "needed to stop it." Wilkins responded that "[t]here's nothing [I] can do about it" because "he [is] our only good cook."
Harmon entered management training in January 1997, and left the Brown Street store to become the manager of another GZK location in May 1997. Harmon took a voluntary demotion and returned to the Brown Street store as an assistant manager in February 1998. Barrett's sexually explicit comments toward her resumed.
One day Harmon was talking with Wilkins and Malloy when either Wilkins or Malloy asked Barrett to retrieve paper products from a shed. Harmon later testified:
 Larry [Barrett] looked at me and said, Pam, why don't you go out there with me. I said leave me alone. He told me, girl, I'll take you out there and rape you. That's when I looked at Tony [Wilkins] and Pat [Malloy] expecting something to happen. They sat there and laughed about it. Later that day I took Tony and Pat out to the lobby and I told them I did not appreciate it. I was raped before, I took [Barrett's comment] very seriously and I did not like it. I wanted something to be done. (Harmon Depo. p. 156).
Barrett's lewd comments toward Harmon continued after this incident. Harmon transferred to the night shift, but she encountered Barrett on other occasions. On one occasion Harmon found Barrett sitting in her desk chair and asked him to move. Instead Barrett grabbed Harmon and pulled her onto his lap and attempted to hold her there. She pulled herself out of his grasp and told him to get away from her.
On June 2, 1998, Barrett came to work two hours late and obviously intoxicated. Harmon told him that she was going to write him up, and Barrett responded: "Girl, you don't want to write me up, I'll hurt you and your children." After Barrett made this statement Harmon complained to Wilkins and Shelley Crouse, a store manager, by telephone. Harmon told them that unless they came in and made Barrett leave, she would leave because she would not work under such conditions. Wilkins and Crouse told her that if she left she would not have a job. When Crouse arrived at the store, Harmon left and never returned to work for GZK.
 B. Crystal Steck's Employment with GZK
Crystal Steck worked for GZK at the Brown Street Lee's Famous Recipe from May 1996 through November 1996. She too met Barrett, who soon began to call her "honey," "baby," and "sweetheart." Barrett often made comments about the size of Steck's breasts, how he wanted "to lick them" and "to suck them." Barrett also stated that he "wanted to fuck [her] in the ass," he "couldn't wait to fuck [her]," and that he would help her with her baby if she would allow him to have sex with her. Barrett also stated that he "wanted to eat [Steck's] pussy" in front of Malloy, who responded "that would be nice."
Steck also attended the meeting at the Brown Street store when Malloy was hired. Steck remembered that Area Supervisor Wilkins, Managers Eric Smith, Malloy, and Keeton, and co-plaintiff Harmon attended the meeting. Steck, like Harmon, remembered that Manager Keeton brought up Barrett. Keeton stated that she was offended by Barrett's conduct, and Steck stated that she was offended as well. Steck also testified that Wilkins said "I don't know what we can do" about Barrett because "he's the only good cook."
Barrett grabbed Steck's breast once in front of Malloy. Barrett also grabbed her buttocks and told her that he "wanted [her] ass" in front of Keeton. Keeton wrote up Barrett as a result of the incident.
In addition, Steck often heard Malloy making comments about a woman applying for a job, saying that if she did not have "big tits or a nice ass, I'm not going to hire her."
In November 1996 Steck, who was pregnant at the time, slipped and fell in the kitchen. Keeton was the manager on duty at the time and told her that she could go to the hospital, but Keeton then called Malloy who said that Steck should not go to the hospital. Steck went to the hospital, against Malloy's orders, and she was put on bed rest for three days. When she attempted to go back to work, Malloy told her that she "would be a better employee" when she was not pregnant.
In November 1997 GZK rehired Steck to work at the Salem Avenue store. There she worked with an employee named Thomas Blake, who made comments about how he wanted "to lick and suck [her] breasts." After the third or fourth comment from Blake, Steck complained to Manager Jerry Zink, who responded "it's not my fault you have big tits." However, Jerry Zink spoke to Blake and the comments stopped.
Steck left employment at the Salem Avenue store in May 1998 after a confrontation with a co-worker. Later that month, Jerry Zink re-hired her to work at the Dixie Drive store, where he was then the manager. One day while Jerry Zink was packing chicken with Steck and Director of Operations, Jim Arden, Zink reached for a box for chicken and brushed Steck's breast. Jerry Zink again said "it's not my fault you have big tits." Steck testified that Arden heard the comment and chuckled. On another occasion Jerry Zink told Steck that she would have been able to lift a box if she did not have "such big tits." Finally, on more than one occasion Jerry Zink told Steck that he "wished that his wife had big tits" like Steck's because "he could do a lot of things in bed with those things."
In July 1998, Steck informed Arden that another employee, Joe Wheeler, harassed her friend Trishaunna Logan. The following day, when she reported to work, Jerry Zink began yelling at her, calling her a liar, and telling her to leave the store. Steck perceived Jerry Zink's conduct to have resulted from her report to Arden the previous day, and she concluded that she had been fired. Jerry Zink testified, however, that he yelled at Steck because she had lied about the reason she had called off work the previous night, and that he did not intend to fire her.
 C. Sonya Johnson's Employment with GZK
Sonya Johnson began working for GZK at the Brown Street location in December 1997. There she also worked with Barrett, who frequently told her that she had "a nice ass," and that "he wouldn't mind having five minutes with [her]." Barrett also made advances toward other women in front of Johnson.
Johnson was promoted to second assistant manager in February 1998, and to first assistant manager in April 1998. When she got the second promotion, Johnson was transferred to the Wilmington Pike store, where she worked from April to October 1998. Johnson claims that while at the Wilmington Pike store, three or four times a week Tad Zink, the store manager, brushed against her buttocks while they were packing orders on the pack line. On some occasions when Tad Zink brushed against her she was able to feel his erect penis. He often said, "oh, baby," and apologized after he touched her, but Johnson believed that the touching was "no accident." Tad Zink denies that the touching was purposeful, but rather was a product of the tight quarters of the pack line that made incidental contact between co-workers inevitable.
Johnson also witnessed Tad Zink engaged in what she deemed to be offensive behavior with other employees, including thrusting his pelvis in the face of a female employee who was sitting down while telling her to "show me how you eat a banana."
Johnson was promoted to store manager and transferred to the North Dixie store in October 1998. She was fired on December 31, 1998.
 II. Proceedings Below
Plaintiffs Harmon, Steck, and Johnson filed a complaint against GZK, Jerry Zink, and Tad Zink alleging hostile work environment sexual harassment, constructive discharge, retaliatory termination, the tort of sexual harassment, negligent supervision and retention, public policy wrongful discharge, and intentional/reckless infliction of emotional distress. Each defendant subsequently moved for summary judgment on the claims against them. On January 5, 2001, the trial court issued five separate decisions that granted summary judgment to all defendants on all claims., Plaintiffs filed timely notice of appeal. We ordered the plaintiffs to reform their brief to conform with App.R. 16(A) on October 1, 2001. Plaintiffs filed their "Supplemental Brief on the Merits" on October 30, 2001. Defendants Jerry Zink and Tad Zink filed a "Request for Dismissal of Appeal" on November 26, 2001, arguing that the Plaintiffs' reformed brief does not meet the requirements of App.R. 16(A), and that the Plaintiffs' incorporation of the fact section from their first brief is contrary to the court's order requiring that no brief exceed forty pages.
Jerry and Tad Zink fail to describe in what ways the plaintiffs' reformed brief fails to meet App.R. 16(A). While it is true that the reformed brief does not contain a statement of facts, in the interest of justice we will incorporate the fact section from the plaintiffs' prior brief. Therefore, we deny Jerry and Tad Zink's request to dismiss the appeal.
The plaintiffs present nine assignments of error.
III. Plaintiffs' Sexual Harassment Claims
 FIRST ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN RULING THAT PLAINTIFFS-APPELLANTS WERE NOT SUBJECTED TO AN OBJECTIVELY HOSTILE WORK ENVIRONMENT IN VIOLATION OF R.C. CH. 4112 AND THE COMMON LAW TORT OF SEXUAL HARASSMENT.
 SECOND ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN DISREGARDING THE STANDARD FOR CO-WORKER SEXUAL HARASSMENT THAT IF THE PLAINTIFFS' EMPLOYER HAS ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE CLAIMED HARASSMENT, IT IS LIABLE.
 THIRD ASSIGNMENT OF ERROR THE TRIAL COURT ERRED BY DISREGARDING THE STANDARD FOR SUPERVISOR SEXUAL HARASSMENT WHICH REQUIRES OR [SIC] EMPLOYER TO ESTABLISH TWO ELEMENTS: (1) THAT IT EXERCISED REASONABLE CARE TO PREVENT AND CORRECT PROMPTLY ANY SEXUALLY HARASSING BEHAVIOR IT HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE [SIC], AND (2) THAT THE PLAINTIFF EMPLOYEE UNREASONABLY FAILED TO TAKE ADVANTAGE OF ANY PREVENTATIVE OR CORRECTIVE OPPORTUNITIES PROVIDED BY THE EMPLOYER.
Summary judgment may not be granted unless the entire record demonstrates that there is no genuine issue of material fact and that the moving party is, on that record, entitled to judgment as a matter of law. Civ.R. 56. The burden of showing that no genuine issue of material fact exists is on the moving party. Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64.
All evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made. Morris v. First National Bank Trust Co. (1970),21 Ohio St.2d 25. "Because a trial court's determination of summary judgment concerns a question of law, we apply the same standard as the trial court in our review of its disposition of the motion; in other words, our review is de novo." Am. States Ins. Co. v. Guillermin (1996),108 Ohio App.3d 547, 552.
R.C. 4112.02(A) makes it an unlawful discriminatory practice "[f]or any employer, because of the * * * sex * * * of any person, * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." "A plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination `because of * * * sex' by proving either of two types of sexual harassment: (1) `quid pro quo' harassment, i.e., harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) `hostile environment' harassment, i.e., harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment." Hampel v. Food Ingredients Specialties, Inc. (2000), 89 Ohio St.3d 169, 176., Plaintiffs' complaint alleged "hostile environment" sexual harassment. "In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the `terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action."
Id. at 176-77.
In Hampel, the court noted that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." Id. at 175.
The Hampel court found that the phrase "terms, conditions, or privileges of employment" found in Title VII "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." Id. at 175 (quoting Meritor Sav. Bank, FSB v. Vinson (1986), 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49,58). "[A] man or woman should not have to run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." Id. at 175-76 (quoting Meritor Sav. Bank, supra, 477 U.S. at 67,106 S.Ct. at 2405, 91 L.Ed.2d at 59).
The Hampel court quoted the following portions of Harris v. Forklift Sys., Inc. (1993), 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295, as a guide in determining whether the conduct alleged is sufficiently serious to constitute a violation of R.C. 4112:
 "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."
 However, the conduct need not be psychologically injurious to be actionable. "A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality."
Id. at 176 (quoting Harris, supra, 510 U.S. at 21-22,114 S.Ct. at 370-371, 126 L.Ed.2d at 302).
The trial court granted summary judgment on each plaintiff's sexual harassment claims because it found that the conduct alleged failed to satisfy all the elements of the Hampel test. Appellants argue that the trial court erred in making this determination.
The first and second elements of the Hampel test, whether "the harassment was unwelcome," and whether "the harassment was based on sex," are subjective factors. It appears that the parties do not dispute that the plaintiffs have satisfied elements one and two for purposes of summary judgment.
The third element of the Hampel test, whether the conduct was "sufficiently severe or pervasive" to affect the plaintiff's employment, presents a most difficult question for the trier of fact. Here the trial court found that the conduct alleged by each of the plaintiffs could not meet this element.
"[I]n order to determine whether the harassing conduct was `severe or pervasive' enough to affect the conditions of the plaintiff's employment, the trier of fact, or the reviewing court, must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." Id. at 181.
Whether a work environment is abusive or hostile "can be determined only by looking at all the circumstances." Id. at 180. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris, supra, 510 U.S. at 23, 114 S.Ct. at 371,126 L.Ed.2d at 302).
The totality of the circumstances test "precludes the kind of analysis that carves the work environment into distinct harassing incidents to be judged each on its own merits." Id. at 181. "Instead, it is essential that the work environment be viewed as a whole, `keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes.'" Id. (quoting Robinson v. Jacksonville Shipyards, Inc. (M.D.Fla. 1991),760 F. Supp. 1486, 1524. "Thus, `even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation.'" Id. (quoting Williams v. Gen. Motors Corp. (C.A.6, 1999),187 F.3d 553, 563).
In addition, "it is generally understood that the `severe or pervasive' requirement does not present two mutually exclusive evidentiary choices, but reflects a unitary concept where deficiencies in the strength of one factor may be made up by the strength in the other." Id. Finally, a plaintiff may also testify to incidents of non-sexual abusive treatment, in addition to sexual conduct, in order to establish the necessary pervasiveness. Id.
The fourth Hampel factor a plaintiff must satisfy concerns notice. A plaintiff must show either "the harassment was committed by a supervisor" or, if by a co-worker, that "the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action." Id. at 176-77. While the Hampel court did not provide guidance on this element, the court appears to incorporate the holdings of two recent companion United States Supreme Court cases, as well as a number of federal cases. See Burlington Indust., Inc. v. Ellerth (1998), 524 U.S. 742,118 S.Ct. 2257, 141 L.Ed.2d 633; Faragher v. Boca Raton (1998), 524 U.S. 775,118 S.Ct. 2275, 141 L.Ed.2d 662.
When the alleged harasser is a supervisor, the employer may be vicariously liable for the supervisor's conduct in creating the hostile work environment. Peterson v. Buckeye Steel Casings (1999),133 Ohio App.3d 715, at 723 (citing Ellerth, supra, 524 U.S. at 763-65,118 S.Ct. at 2270, 141 L.Ed.2d at 654-55). Vicarious liability is a form of indirect legal responsibility that operates to make a principal liable for the acts of its agents. However, the employer confronted with that claim may avail itself of the Ellerth/Faragher affirmative defense to vicarious liability for a supervisor's conduct. Id. To raise the affirmative defense, the employer must establish two elements by the preponderance of the evidence:
 (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.
Ellerth, supra, 524 U.S. at 765, 118 S.Ct. at 2270, 141 L.Ed.2d at 655. While proof that an employee unreasonably failed to fulfill the obligation to avoid harm is not limited to a showing that the employee unreasonably failed to use any complaint procedure provided by the employer, "a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the affirmative defense." Id.
When the alleged harasser is not a supervisor but a co-worker, neither vicarious liability nor the affirmative defense to vicarious liability applies. However, the employer may be liable to the plaintiff based on its own independent negligence in failing to prevent the resulting hostile work environment. Peterson, supra. An employer may be liable for co-worker harassment "when the employer knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." Id. at 724 (citing Blankenship v. Parke Care Ctrs., Inc. (C.A.6, 1997) 123 F.3d 868, 872-73).
"The `knew or should have known' standard in co-worker cases means that an employer's actual knowledge of the harassment is unnecessary." BreMiller v. Cleveland Psychiatric Inst. (N.D.Ohio., 2000),195 F.R.D. 1, 28. In other words, an employee need not actually report an incident of sexual harassment, and an employer will not necessarily escape liability if the employee does not. Id. "An employer may be charged with knowledge when an employee or employees complain to management, or when the sexual harassment is pervasive, which gives rise to an inference of knowledge or constructive knowledge." Id.
In addition, an employer can be presumed to have knowledge of harassment if
 its supervisors had actual knowledge of the harassment (some of them may have participated in the harassment, some may have simply worked closely with those who did, and others may have been informed of harassment by women who were not their direct subordinates) and if these supervisors had a duty or reasonably could be believed to have such a duty, under the company's sexual harassment policy, to pass on the information to someone within the company who has the power to do something about it.
Id. at 29 (internal citations omitted). See also Hogan v. Field Container Corp. (August 15, 2001), Marion App. No. 9-01-11, unreported.
In addition to statutory sexual harassment, Ohio has also recognized the common law tort of sexual harassment. See Kerans v. Porter Paint Co. (1991), 61 Ohio St.3d 486. Although Kerans failed to provide the elements of the tort of sexual harassment, courts interpreting Kerans have applied the elements of a R.C. chapter 4112 sexual harassment claim. Seiber v. Wilder (Oct. 12, 1994), Greene App. No. 94 CA 32, unreported.
Having summarized the law on this issue, we will now apply it to the sexual harassment claims brought by the individual plaintiffs.
A. Pamela Harmon's Sexual Harassment Claims Against GZK
The trial court determined that Harmon had failed to present sufficient evidence on the elements of a sexual harassment claims to avoid summary judgment. We do not agree.
It is clear from the record, and the trial court found, that Harmon has met the first and second prong of the Hampel test, that the harassment was unwelcome and that the harassment was based on sex.
Turning to the third prong, whether Barrett's actions toward Harmon were so severe or pervasive as to affect Harmon's employment with GZK, we believe that the trial court erred when it found that Harmon did not satisfy this element. It is difficult to conceive of any more thoroughly offensive comments than those Barrett allegedly made toward Harmon. Barrett frequently requested anal sex from Harmon. Barrett also requested oral sex from Harmon, told her that he would rape her, and threatened to hurt her and her children. These comments were not isolated, but instead evince a pattern of lewd and disgusting verbal abuse. In addition, Barrett frequently rubbed his body against Harmon, on one occasion grabbed her buttocks, and once grabbed her and made her sit on his lap. Viewing the evidence in the light most favorable to Harmon as Civ.R. 56(C) requires, we find that Barrett's actions were sufficiently severe and pervasive.
In addition, there is evidence in the record that Barrett's abuse affected Harmon's job performance. Harmon testified that she avoided certain duties because she was attempting to avoid contact with Barrett, that the abuse affected her relations with customers and fellow employees, and that the abuse caused her to make mistakes. Barrett's pattern of harassment culminated in Harmon walking off of the job after Barrett told her that he would harm her and her children if she wrote him up for reporting to work intoxicated. As noted above, non-sexual abusive treatment may be considered when measuring pervasiveness. Hampel, supra.
Applying the factors Hampel advanced to measure whether the alleged conduct was "severe or pervasive," there is evidence that Barrett's conduct was frequent, that it was, at times, severe, that it was also, at times, physically threatening and intimidating, and that it affected Harmon's work performance. Therefore, viewing the totality of the circumstances in the light most favorable to Harmon, we find that she has met her burden regarding whether the conduct was sufficiently severe or pervasive to affect her employment with GZK, the third prong of the Hampel test.
With regard to the final Hampel element, whether the conduct was committed by a supervisor or the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action, Harmon does not claim supervisor harassment, only co-worker harassment with respect to Barrett's conduct.
The trial court found that Harmon "initiated no action to prevent such conduct or to report such conduct." However, there is evidence that Harmon told Wilkins, Malloy and Keeton about Barrett's harassment (an issue that was, in fact, brought up at the meeting by Keeton). In addition, Wilkins and Malloy witnessed Barrett tell Harmon that he would "rape" her while they were in the shed, and after the incident Harmon complained to both men about Barrett's comments and their indifferent responses to his comments. This evidence, when viewed in the light most favorable to Harmon, shows that GZK knew or should have known of Barrett's harassing behavior toward Harmon. See Peterson, supra.
Therefore, for purposes of Civ.R. 56(C), we find that Pamela Harmon has presented sufficient evidence on all elements of the Hampel test to survive summary judgment on her statutory and common law sexual harassment claims. Thus, the trial court erred when it granted summary judgment on these claims to GZK.
 B. Crystal Steck's Sexual Harassment Claims Against GZK
The trial court found that Steck had failed to present sufficient evidence on the elements of her sexual harassment claims and granted summary judgment for defendants. Again, we do not agree with the trial court's finding.
It is clear from the record, and the trial court found, that Steck met the first and second prong of the Hampel test, that the harassment was unwelcome and that the harassment was based on sex. Turning to the third prong, whether Barrett, Blake, Malloy, and Jerry Zink's conduct toward Steck was so severe or pervasive as to affect Steck's employment with GZK, we find that the trial court erred when it found that Steck did not satisfy this element.
The frequent comments that Barrett made to Steck were, like those he made to Harmon, objectively highly offensive. Barrett told Steck that he wanted to "lick" and "suck" her breasts, "eat her pussy," and "fuck her in the ass." In addition to these repeated sexually charged comments, Barrett grabbed Steck's breast once and her buttocks once. When he grabbed her buttocks, he told her that he "wanted [her] ass." Steck also alleges that she suffered similar, yet less severe and pervasive, harassment from Blake, which GZK management corrected, and from Malloy and Zink.
Viewing the totality of the circumstances in the light most favorable to Steck, we find that the harassment that she alleges sufficiently severe and pervasive to have affected the conditions of her employment. Applying the factors Hampel used to measure whether the alleged conduct was "severe or pervasive," we find that the harassing conduct was frequent, and that it was at times severe. While the harassment that Steck suffered may have been less physically threatening and intimidating than that suffered by Harmon, it was more than merely offensive utterances. Finally, while we find no place in the record where Steck explicitly stated the ways in which the harassment affected her employment, we find that the job performance of a reasonable person subjected to the demeaning harassment that Steck was consistently subjected to would necessarily suffer.
In essence, we find that Steck was forced to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work" for GZK. See Hampel, supra, at 175-176. Therefore, we find that Steck has presented sufficient evidence to meet the third prong of the Hampel test, that the alleged conduct was severe or pervasive.
Finally, turning to the fourth prong of Hampel, whether the conduct was committed by a supervisor or the employer knew or should have known harassment by its employee and failed to take immediate and appropriate corrective action, Steck claims both supervisor and co-worker sexual harassment.
The trial court found that Steck, like Harmon, "initiated no action to prevent such conduct or to report such conduct." However, Steck told Wilkins, Malloy, Smith and Keeton about Barrett's harassment during a staff meeting, an issue that was, in fact, brought up at the meeting by Keeton. In addition, Malloy and Keeton witnessed Barrett touch Steck inappropriately on separate occasions, and Steck reported Blake's sexual comments to Jerry Zink, who reprimanded him.
When the alleged harasser is a co-worker, the employer may be liable based on its own negligence. Peterson, supra. The standard is whether the employer knew or should have known of the harassment and failed to take corrective measures. Id. As noted above, pervasive sexual harassment gives rise to an inference of knowledge or constructive knowledge. BreMiller, supra, at 28. The evidence here demonstrates that GZK management was well aware of Barrett's harassing behavior toward Steck.
In addition, some of the members of management allegedly witnessed the harassment and engaged in the harassment themselves, albeit to a lesser extent. An employer may be presumed to be on notice of the harassing behavior if its supervisors had actual knowledge of the harassment, through participation in the harassment, close work with those who participated, or information from subordinates, and a duty to inform management of the harassment. Id. at 29. Therefore, there is evidence that GZK knew or should have known of the harassment that Steck allegedly suffered from Barrett and should have taken appropriate measures to ensure that the harassment ceased.
With regard to the harassment Steck allegedly suffered from her supervisors, Malloy and Zink, GZK may raise the Ellerth/Faragher affirmative defense: first, that GZK exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and second, that Steck failed to take advantage of any preventative or corrective opportunities provided by GZK or to avoid harm otherwise. GZK must meet both elements of the test.
The 1996 GZK Employee Handbook states that sexual harassment "is a form of employee misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited." The 1998 Handbook states that sexual harassment "includes unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct that is sexual in nature."
The 1996 and 1998 Employee Handbooks essentially state that an employee should inform his or her supervisor of any harassment. If the employee feels that it would be inappropriate to inform their supervisor (i.e. that person is the harasser), then the employee is instructed to inform the Personnel Director or the Human Resources Coordinator.
Viewing the facts in the light most favorable to Steck, the evidence demonstrates that GZK has implemented an appropriate sexual harassment policy, and that the employees were made aware of the policy, arguably satisfying the first prong of the Ellerth/Faragher defense. With regard to the second prong, the record shows that Steck failed to notify GZK of the harassment allegedly suffered by her from her supervisors, Malloy and Zink. Therefore, GZK has met the elements of the affirmative defense to a supervisor sexual harassment claim by a preponderance of the evidence.
However, because Steck has met the fourth prong of Hampel with respect to Barrett's harassment, we find that Steck's harassment claim survives summary judgment because she has presented sufficient evidence that GZK knew or should have known of Barrett's harassing conduct. Therefore, Steck has met each element of the Hampel test.
Accordingly, for purposes of Civ.R. 56(C), we find that the trial court erred when it granted summary judgment in favor of GZK on Steck's statutory and common law sexual harassment claims.
 C. Sonya Johnson's Sexual Harassment Claims Against GZK
The trial court determined that Johnson failed to present sufficient evidence on the elements of her sexual harassment claims, and therefore granted summary judgment for defendants. Again, we do not agree with the trial court's determination.
It is clear from the record, as the trial court found, that Johnson has met the first and second prong of the Hampel test, that the harassment was unwelcome and that the harassment was based on sex. Turning to the third prong, whether Barrett and Tad Zink's conduct toward Johnson was so severe or pervasive as to affect Johnson's employment with GZK, we find that the trial court erred when it found that Johnson did not satisfy this element.
The frequent comments that Barrett made to Johnson, like those he made to Harmon and Steck, are objectively offensive. Barrett often told Johnson that she had "a nice ass," asked her to have sex with him, and told her that "he wouldn't mind having five minutes with [her]." These comments occurred at least three times a week. Johnson also witnessed Barrett's harassment of other women.
Johnson also alleges that she suffered harassment from Tad Zink after she transferred to the store where he was the manager. Johnson stated that Tad Zink brushed against her buttocks, often with an erection, three or four times a week. While Tad Zink stated that the contact was an accident, Johnson stated that the contact was far too frequent to be an accident. Johnson also witnessed Tad Zink engaged in what she perceived to be harassing behavior with other female employees.
Further, Johnson testified that the harassment affected her job performance. She stated that "I was not able to do my job the way that it should have been done" because of the harassment and "I felt like the company I worked for didn't care and, therefore, why should I care." Johnson also stated that the harassment gave her headaches and stomach aches, and she "cried a lot."
Viewing the totality of the circumstances in the light most favorable to Johnson, we find that Johnson has demonstrated that the harassment she suffered while employed with GZK was sufficiently severe and pervasive to meet the third element of the Hampel test. Applying the factors Hampel advanced to measure whether the alleged conduct was "severe or pervasive," we find that Barrett and Zink's conduct was frequent, that it was, at times, severe, and that it was, especially with respect to Tad Zink's alleged touching, more than simply offensive utterances. In addition, there is evidence that it affected Johnson's work performance.
Regarding the fourth prong of Hampel, whether the conduct was committed by a supervisor or the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action, Johnson also claims both supervisor and co-worker sexual harassment.
The trial court found that Johnson "never complained either orally or in writing" about the conduct to GZK management. Our review of the record supports this finding. However, the analysis does not end there.
Again, when the alleged harasser is a co-worker, the employer may be liable based on its own negligence. Peterson, supra. The standard is whether the employer knew or should have known of the harassment and failed to take corrective measures. Id. In addition, pervasive sexual harassment gives rise to an inference of knowledge or constructive knowledge, because it should have "come to the attention of someone authorized to do something about it." BreMiller, supra, at 28-29.
We find ample evidence in the record that GZK management was well aware of Barrett's harassing behavior toward other employees. In addition, one member of management allegedly engaged in the harassment, which bolsters the presumption that the employer knew or should have known of the harassment. See id. Therefore, we find that GZK knew or should have known of the harassment that Johnson allegedly suffered from Barrett and should have taken appropriate measures to ensure that the harassment ceased.
With regard to the harassment Johnson allegedly suffered from her supervisor Tad Zink, GZK may raise the Ellerth/Faragher affirmative defense: first, that GZK exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and second, that Johnson failed to take advantage of any preventative or corrective opportunities provided by GZK or to avoid harm otherwise. GZK must meet both elements of the test.
Viewing the facts in the light most favorable to Johnson, we again find that GZK has implemented an appropriate sexual harassment policy and that the employees were made aware of the policy, which satisfies the first prong of the Ellerth/Faragher defense. With regard to the second prong, we find that Johnson failed to notify GZK of the harassment that she allegedly suffered from Tad Zink. Therefore, GZK has met the elements of the affirmative defense to a supervisor sexual harassment claim by a preponderance of the evidence.
However, because Johnson, like Steck, has presented evidence that GZK knew or should have known of Barrett's harassment, we find that Johnson's harassment claim against GZK survives as well because she has presented sufficient evidence on all elements of the Hampel test.
Therefore, for purposes of Civ.R. 56(C), we find that the trial court erred when it granted summary judgment in favor of GZK on Johnson's statutory and common law sexual harassment claims.
 D. Sonya Johnson's Sexual Harassment Claims Against Tad Zink
The trial court granted Tad Zink's motion for summary judgment on Johnson's claims against him individually for sexual harassment contrary to R.C. Ch. 4112 and common law sexual harassment.
The Ohio Supreme Court has held that, under the statute, supervisors and managers may be held individually accountable for their own discriminatory conduct occurring in the workplace environment. Genaro v. Cent. Transport, Inc. (1999), 84 Ohio St.3d 293. See also Peterson, supra. The Genaro court noted that a plaintiff's claim against a supervisor presupposes employer liability. Id. at 296.
The trial court recognized that an employee could bring a statutory claim against a supervisor individually, but declined to extend individual liability to Johnson's common law claim, citing Arthur v. Armco, Inc. (S.D.Ohio, 2000), 122 F. Supp.2d 876. Johnson supports her argument with two cases decided prior to Genaro: Seiber v. Wilder (Oct. 12, 1994), Greene App. No. 94 CA 32, unreported, and Wille v. Hunkar Lab., Inc. (1998), 132 Ohio App.3d 92, wherein this court, along with the First Appellate District of Ohio, found that a supervisor could be held individually liable for common law sexual harassment.
While Arthur was decided after Genaro, the district court's finding did not explicitly rely on it, because Genaro is silent on this issue. Rather, the Arthur court noted that statutory liability was extended to common law claims based on the definition of "employer" found in R.C.4112.01(A)(2), and therefore only applies to the liability of an "employer."
However, we prefer to rely on our determination in Sieber, supra:
 In the absence of guidance from [the Ohio Supreme Court] . . . we look to the civil rights statutes providing redress for sexual harassment claims. R.C. 4112.01 et. seq. The definition of "employer" in R.C. 4112.01(A)(2) has been construed to include supervisors. Davis v. Black (1991), 70 Ohio App.3d 359, 370. We have no reason to think that the supreme court would have intended a narrower definition of "employer" in articulating the common law duty than as "employer" is defined in the statutory scheme.
Id. at **5.
Therefore, we will analyze Johnson's statutory and common law sexual harassment claims against Tad Zink individually, employing the Hampel elements.
We find again, even viewing Tad Zink's behavior alone, that Johnson has met the first and second prong of the Hampel test, that the alleged harassment was unwelcome and based on sex.
Regarding the third prong, whether Tad Zink's conduct toward Johnson was so severe or pervasive as to affect Johnson's employment with GZK, we find Johnson has presented a genuine issue of material fact regarding whether the harassment she suffered was "severe and pervasive."
Johnson alleges that Tad Zink harassed her during the six months that they worked together. Johnson alleges that Tad Zink brushed his crotch area against her buttocks, often while he had an erection, three or four times a week. While Tad Zink stated that the contact was an accident, Johnson stated that the contact was far too frequent to be an accident. Johnson also witnessed Tad Zink engaged in what she perceived to be harassing behavior with other female employees. Further, as noted above, Johnson testified that the harassment affected her job performance.
Applying the factors Hampel advanced to measure whether the alleged conduct was "severe or pervasive," we find that Zink's conduct was frequent and severe, and, as noted above, that it was more than simply offensive utterances. In addition, there is evidence that it affected Johnson's work performance. Viewing the totality of the circumstances, in the light most favorable to Johnson, we find that Johnson has demonstrated that the harassment she suffered form Tad Zink while employed with GZK was sufficiently severe and pervasive to meet the third element of the Hampel test.
Regarding the fourth prong of Hampel, whether the conduct was committed by a supervisor, or the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action, we find that because Tad Zink was her supervisor, Johnson has met the fourth prong as well.
However, unlike above, where GZK was able to raise the Ellerth/Faragher affirmative defense, Tad Zink may not raise the defense because it only operates to protect employers from claims of vicarious liability stemming from the actions of their employees. Ellerth, supra, 524 U.S. at 807,118 S.Ct. at 2292-93, 141 L.Ed.2d at 689. While Ellerth and Faragher do not explicitly address the issue of individual employer liability, it would be counter-intuitive to find that a supervisor could insulate himself from liability stemming from his own conduct because he has promulgated appropriate sexual harassment policies and the employee failed to follow the policy. Therefore, we decline to extend the Ellerth/Faragher affirmative defense to individual supervisor liability.
Therefore, for purposes of Civ.R. 56(C), we find that the trial court erred when it granted summary judgment in favor of Tad Zink on Johnson's statutory and common law sexual harassment claims.
 E. Conclusion: Plaintiffs' Sexual Harassment Claims
We therefore find that the trial court erred when it granted summary judgment for GZK on Harmon, Steck, and Johnson's claims for common law and statutory sexual harassment. We also find that the trial court erred when it granted summary judgment to Tad Zink on Johnson's claims for individual common law and statutory sexual harassment.
Accordingly, the plaintiffs' first, second, and third assignments of error are sustained.
 IV. Plaintiffs' Negligent Supervision and Retention Claims FOURTH ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN RULING AS A MATTER OF LAW THAT A COMPANY CANNOT BE HELD LIABLE FOR NEGLIGENT SUPERVISION OR NEGLIGENT RETENTION OF AN EMPLOYEE WHO IS ENGAGING IN EGREGIOUS TORTIOUS CONDUCT, UNLESS THE PERSON IS ALSO INCOMPETENT AT PERFORMING THE SPECIFIC DUTIES HE WAS HIRED TO PERFORM.
 FIFTH ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN GRANTING DEFENDANT GZK'S MOTION FOR SUMMARY JUDGMENT REGARDING PLAINTIFFS' CLAIMS FOR NEGLIGENT SUPERVISION OR NEGLIGENT RETENTION.
Plaintiffs allege under the fourth and fifth assignments of error that the trial court erred in granting summary judgment to GZK on Plaintiffs' negligent retention and negligent supervision claims.
The elements of a claim for relief for negligent hiring or retention are:
(1) the existence of an employment relationship;
(2) the employee's incompetence;
 (3) the employer's actual or constructive knowledge of such incompetence;
 (4) the employee's act or omission causing the plaintiff's injuries; and
 (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.
Peterson, supra, at 729. See also Ruta v. Breckenridge-Remy Co. (1982),69 Ohio St.2d 66, 69. Courts have applied these elements to a claim of negligent supervision as well. See Peterson, supra; Steppe v. K-Mart Stores (Nov. 18, 1999), Cuyahoga App. No. 74884, unreported.
In Kerans v. Porter Paint Co. (1991), 61 Ohio St.3d 486, the court explained:
 An employer has a duty to provide its employees with a safe work environment and, thus, may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees * * *. [W]here an employer knows or has reason to know that one of his employees is sexually harassing other employees, he may not sit idly by and do nothing.
Id. at 493. See Myers v. Goodwill Indust. of Akron, Inc. (1998),130 Ohio App.3d 722.
While the trial court addressed the negligent supervision and retention issue separately, GZK argues that an actionable claim of sexual harassment by an employee is a prerequisite to a claim of negligent retention based on sexually harassing behavior, citing Myers, supra. However, a close reading of Myers and its antecedent, Kerans, reveals that those courts did not require an actionable claim for sexual harassment in order to bring negligent supervision and retention claims. Rather, they stated that where a sexual harassment claim exists, a claim for negligent supervision and retention may lie as well. Regardless, the issue is moot because we found that each plaintiff has presented an actionable claim for workplace sexual harassment. Therefore, we need not decide that particular issue.
The trial court found that the offensive conduct alleged by the plaintiffs did not portray incompetence, and therefore granted summary judgment to GZK on each plaintiff's claim. We have not found precedent that defines "incompetence" in relation to negligent supervision and retention claims that allege sexually harassing behavior. However, for purposes of the second element of the negligent supervision and retention test, we find that sexually harassing behavior is per se incompetent behavior, based on our reading of Kerans and Myers.
In this context, incompetence relates not only or exclusively to an employee's lack of ability to perform the tasks that his or her job involves. It also relates to behavior while on the job inapposite to the tasks that a job involves and which materially inhibits other employees from performing their assigned job tasks. Sexually harassing behavior is within that definition.
The evidence, viewed in a light most favorable to the plaintiffs, demonstrates that each plaintiff presented sufficient evidence for purposes of Civ.R. 56(C) regarding each element of a claim for negligent supervision and retention: 1) the alleged harassers maintained employment relationships with GZK; 2) the alleged harassers are incompetent by virtue of their harassing conduct; 3) GZK had actual or constructive knowledge of the harassing conduct, as noted in our discussion of the sexual harassment claims, above; 4) GZK's failed to appropriately discipline the alleged harassers or otherwise remedy the situation; and 5) GZK's negligence in retaining and supervising the alleged harassers was the proximate cause of the plaintiffs' injuries. Accordingly, the trial court erred in granting summary judgment to GZK on the plaintiffs negligent supervision and retention claims because the plaintiffs have presented a genuine issue of material fact.
The fourth and fifth assignments of error are sustained.
 V. Constructive Discharge/Retaliatory Termination Claims SIXTH ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN RULING AS A MATTER OF LAW THAT PLAINTIFF HARMON WAS NOT CONSTRUCTIVELY DISCHARGED IN VIOLATION OF R.C. CH. 4112 AND THE COMMON LAW TORT OF PUBLIC POLICY AGAINST SEXUAL HARASSMENT.
Plaintiff Harmon argues that the trial court erred when it granted summary judgment to GZK on her claims for constructive discharge contrary to R.C. Ch. 4112 and for wrongful discharge in violation of public policy. We will first address the constructive discharge claim.
"The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." Mauzy v. Kelly Services, Inc. (1996),75 Ohio St.3d 578, paragraph four of the syllabus. The Mauzy court explained:
 In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the "discharge" label.
Id. at 589.
A number of courts have found that sexual harassment in the workplace may make employment conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign. See Wille v. Hunkar Labs., Inc. (1998), 132 Ohio App.3d 92; Scandinavia Health Spa, Inc. v. Ohio Civil Rights Comm. (1990), 64 Ohio App.3d 480.
In Wille, the plaintiff endured two years of sexual harassment, and after she contacted an attorney who wrote the company a letter, she was excluded from necessary training sessions, berated in front of co-workers for bringing claims against the company, and told that no one wanted to work with her. Wille, supra, at 106. The court determined that the evidence raised a genuine issue of material fact regarding the plaintiff's constructive discharge claim, and reversed the summary judgment entered in favor of the defendant on that issue. Id. at 107.
Here, Harmon withstood serious harassment from Barrett during her two stints at the Brown Street store, including the statement that he would rape her, for almost a year and a half. Then, on June 2, 1998, Barrett came to work late and obviously intoxicated and threatened to harm Harmon and her children if she wrote him up. When Wilkins and Crouse told her that if she left she would not have a job, it was inevitable that she would choose to leave rather than continue to work with Barrett.
The cumulative effect of Barrett's comments, which included threats of violence, and Barrett's unwelcome touching, coupled with GZK's knowledge of this behavior and failure to remedy the situation, was evidence of actions more than a reasonable person under those circumstances might endure. Therefore, we find that Harmon has presented at least a genuine issue of material fact regarding whether her working conditions were so intolerable that a reasonable person under the circumstances would have felt compelled to resign. Accordingly, we find that the trial court erred when it granted summary judgment to GZK on the issue of constructive discharge.
Turning to the Harmon's claim for wrongful discharge in violation of public policy, the Supreme Court has recognized that a cause of action may be brought for wrongful discharge in violation of public policy based on sexual harassment or discrimination. Collins v. Rizkana (1995),73 Ohio St.3d 65, syllabus. The Collins court adopted a four part test for analyzing a claim:
 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).
Id. at 69-70.
The clarity and jeopardy elements of the tort of wrongful discharge are questions of law to be determined by the court. Id. at 70. Conversely, the causation and overriding justification elements are questions of fact for the trier of fact. Id.
Following the Collins court, we find that there exists a clear public policy against sexual harassment in Ohio. See id. Second, we also find that this policy would be jeopardized if an employer is permitted to dismiss employees who are sexually harassed.
Addressing the third element, whether the dismissal was motivated by conduct related to the public policy, as noted above we find that reasonable minds could find that Harmon's constructive dismissal was caused by the harassment she endured from Barrett. Finally, regarding the fourth element, we find no evidence that discloses any justification for GZK's alleged indifference. Therefore, the trial court erred when it granted summary judgment to GZK on Harmon's public policy wrongful discharge claim as well.
The sixth assignment of error is sustained.
 SEVENTH ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN RULING AS A MATTER OF LAW THAT PLAINTIFF STECK WAS NOT TERMINATED IN RETALIATION FOR COMPLAINING ABOUT SEXUAL HARASSMENT IN VIOLATION OF R.C. CH. 4112 AND OHIO'S COMMON LAW TORT OF PUBLIC POLICY AGAINST RETALIATION AND THAT HARMON WAS NOT CONSTRUCTIVELY DISCHARGED IN VIOLATED [SIC] OF OHIO'S COMMON LAW TORT OF PUBLIC POLICY AGAINST SEXUAL HARASSMENT.
Steck argues that the trial court erred in granting summary judgment to GZK and Jerry Zink on her claims of retaliatory discharge and common law wrongful discharge.
To establish a prima facie case of retaliatory termination, a plaintiff must prove that: "(1) she engaged in a protected activity; (2) the employer knew of her participation in the protected activity; and (3) the alleged retaliatory action followed the plaintiff's participation in the protected activity sufficiently close in time to warrant an inference of retaliatory motivation." Neal v. Hamilton Co. (1993), 87 Ohio App.3d 670,677-78. If the plaintiff meets this burden, "the employer must then articulate a legitimate, nondiscriminatory reason for its action and the plaintiff must then show the reason to be pretextual." Id. at 678. "The plaintiff cannot prevail if it appears from the evidence that the employer would have made the same decision regardless of plaintiff's participation in the protected activity." Id.
As noted above, Steck was confronted by Jerry Zink, who called her a "liar" when she reported to work and told her to leave the store. Steck perceived that she was fired after this confrontation. Steck argues that she was terminated because, the day before her termination, she made a sexual harassment complaint to Jim Arden regarding Joe Wheeler's alleged harassment of Trishuanna Logan.
While Steck appears to have met the first element, that she was engaged in a protected activity, she has failed to present evidence that Jerry Zink knew of her discussion with Arden. Jerry Zink testified that he did not have knowledge of the discussion between Arden and Steck. He stated that he called her a "liar" and told her to leave because she failed to report to work the previous day.
Steck has offered nothing beyond conjecture regarding whether Jerry Zink knew that she had engaged in a protected activity. Therefore, she has failed to offer sufficient proof as to this element, and we find that summary judgment was properly granted to GZK and Jerry Zink.
Turning to Steck's claim for common law wrongful discharge, as noted above, the Supreme Court of Ohio has developed a four part test for this determination. Collins, supra. However, we cannot find that Steck has presented sufficient evidence to survive summary judgment on the third prong, whether the plaintiff's dismissal was motivated by conduct related to the public policy. Again, we find no evidence that Jerry Zink fired Steck in retaliation for her report to Arden, other than Steck's mere speculation regarding his motivation. Therefore, the trial court did not err in granting GZK and Jerry Zink's motions for summary judgment on this issue.
In addition, it appears that the second half of the assignment of error, dealing with Harmon's claims for constructive discharge and common law wrongful discharge, is redundant. Because we addressed those issues fully under the sixth assignment of error, and plaintiffs make no mention of these issues in their arguments under the seventh assignment, we will not address them again.
The seventh assignment of error is overruled with respect to Steck's claims.
 VI. Intentional Infliction of Emotional Distress Claim EIGHTH ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN GRANTING JUDGMENT AS A MATTER OF LAW [SIC] ON PLAINTIFF HARMON'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.
To prevail on a claim for intentional infliction of emotional distress a plaintiff must demonstrate four elements:
 1. That the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
 2. That the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community,"
 3. That the actor's actions were the proximate cause of plaintiff's psychic injury; and,
 4. That the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it,"
Takach v. American Medical Tech. (1998), 128 Ohio App.3d 457, 471. See Pyle v. Pyle (1983), 11 Ohio App.3d 31, 34.
In Yeager v. Local Union 20, Teamsters, Chauffers, Warehousemen 
Helpers of America (1983), 6 Ohio St.3d 369, the court explained that with respect to the second element, whether the conduct was extreme and outrageous,
 Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
 The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.
Id. at 375 (quoting Restatement of the Law 2d, Torts (1965) 73, Section 46(1)).
The trial court found that since Barrett did not sexually harass Harmon, "there can't be a finding that his actions were extreme or reckless or had the intent of causing emotional distress." Because we found above that Harmon has presented sufficient evidence on her sexual harassment claims, we will now address her intentional infliction of emotional distress claim in light of the elements noted above.
With regard to the first element, whether the actor intended to cause emotional distress, or knew or should have known that his actions would result in serious emotional distress, the evidence suggests that Harmon told Barrett to stop bothering her and complained to GZK about his conduct, but his conduct became only more extreme as time passed. In addition, Barrett and GZK should have known that the comments that he would "rape" Harmon and that he would harm her and her children were bound to result in emotional distress. Therefore, Harmon has at least presented a genuine issue of material fact on this element.
Regarding the second element, whether Barrett's comments were outrageous and extreme, Harmon surely presents a genuine issue, for all of the reasons stated throughout this opinion. Barrett's alleged behavior clearly "goes beyond all possible bounds of decency."
Harmon has presented sufficient evidence on the third element, causation, as well. In particular, Harmon stated that Barrett's conduct, and GZK's failure to correct the situation, "gave me the same feeling of being molested. It made me feel degrading [sic]. It affected my job performance. It affected my home. It affected my children. It affected myself."
Finally, we find that Harmon has raised a genuine issue of material fact regarding whether her alleged mental anguish was so serious that no reasonable person should be expected to endure it. She has presented evidence that she sought counseling and that she has been placed on anti-depressants as a result of the harassment.
Therefore, the trial court erred in granting summary judgment in favor of GZK on Harmon's claim of intentional infliction of emotional distress. Accordingly, the eighth assignment of error is sustained.
 VII. Punitive Damages, Fees, and Costs NINTH ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN RULING AS A MATTER OF LAW THAT PUNITIVE DAMAGES, LITIGATION COSTS, AND REASONABLE ATTORNEYS' FEES COULD NOT BE AWARDED.
In each decision granting summary judgment to GZK on each plaintiff's claims, the trial court noted that no punitive damages, attorney fees, and costs could be awarded because summary judgment was granted on all issues. Also, in the decisions granting summary judgment to Tad Zink and Jerry Zink, the trial court did not award punitive damages, attorneys fees, or costs to the plaintiffs.
Of course, the trial court did not grant punitive damages, attorneys fees, and costs after it found that none of the plaintiffs' claims survived summary judgment for the Defendants. However, because we find that the trial court erred in granting summary judgment to GZK on a number of the plaintiffs' claims, and to Tad Zink on one claim, the trial court's rulings on punitive damages, attorneys fees, and costs where appropriate, are moot.
The ninth assignment of error is sustained.
 VIII. Conclusion
With respect to plaintiff Harmon's claims against GZK, we reverse the summary judgment of the trial court with respect to her claims for 1) statutory sexual harassment, 2) common law sexual harassment, 3) constructive discharge, 4) common law wrongful discharge, 5) negligent supervision and retention, and 6) intentional infliction of emotional distress.
With respect to Steck's claims against GZK, we reverse the summary judgment of the trial court with respect to her claims for 1) statutory sexual harassment, 2) common law sexual harassment, and 3) negligent supervision and retention. We affirm the trial court's summary judgment in favor of GZK and Jerry Zink with respect to Steck's claims for 1) retaliatory discharge, and 2) common law wrongful discharge.
Finally, with respect to Johnson's claims against GZK and Tad Zink, we reverse the summary judgment of the trial court with respect to her claims of 1) statutory sexual harassment, 2) common law sexual harassment, and 3) negligent supervision and retention.
Judgment affirmed in part, reversed in part, and remanded for further proceedings not inconsistent with this opinion.
BROGAN, J. and FAIN, J., concur.